2005 SD 116

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Michael Joseph Christopher KOTTMAN, Defendant and Appellant.**

**No. 23443.**

Supreme Court of South Dakota.

Argued On Oct. 3, 2005.

Decided Nov. 22, 2005.

Lawrence E. Long, Attorney General, Ann C. Meyer, Assistant Attorney General, Pierre, South Dakota, Attorneys for plaintiff and appellee.

John R. Hinrichs, Minnehaha County Public Defender's Office, Sioux Falls, South Dakota, Attorneys for defendant and appellant.

KONENKAMP, Justice.

[¶ 1.] As a condition of his release on parole, defendant signed a waiver allowing warrantless searches of his home and person by parole agents or law enforcement officers, whenever a reasonable suspicion arose that he was violating a condition of his parole. Sioux Falls police suspected defendant in a burglary that appeared to have been an "inside job." Defendant had recently been fired from the burglarized business. Because the officers knew defendant had signed a waiver, they searched his home without a warrant. They found a methamphetamine pipe, and defendant was charged and convicted of possession of a controlled substance. In this appeal, defendant contends that the warrantless search was illegal, and even if his waiver allowed for this type of search, there was still no reasonable suspicion to justify it. We affirm.

### Background

[¶ 2.] Defendant, Michael J. Kottman, signed a supervision agreement in 2000, allowing a *parole agent* to search his "person, property, place of residence, vehicle and personal effects" when *"reasonable cause* is ascertained." (Emphasis added). Then in 2002, as a result of the United States Supreme Court decision in *United States v. Knights*, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001), the South Dakota Department of Corrections amended the terms of the waiver condition in South Dakota parole agreements. First, reasonable cause was changed to reasonable suspicion, and, second, both parole agents and law enforcement officers were permitted to conduct warrantless searches.[1] Kottman signed his new parole supervision agreement on March 6, 2002.

---

1. The exact language of the waiver condition states: "I will submit my person, property,

[¶ 3.] On November 16, 2003, the security alarm went off at Empire Plastics, a Sioux Falls business. The alarm sounded at 2:52 p.m., and two Sioux Falls police officers arrived four minutes later. Officers Kurtis Daughters and Travis Olsen noticed a broken exterior window. They contacted the business owner, Doug Edwards, and foreman, Nick Swier, who assisted them in examining the premises. The owner, Edwards, identified the location of the motion sensors and indicated that only one had been activated. He also told the officers that nothing seemed out of place and that the only thing missing was "the metal cash box, which contained between $200 and $300, and which had been kept inside a back office closet." Because the business had multiple motion sensors and only one was activated and also because the cash box was in the closet of an interior office, where there were no motion sensors, Edwards told the officers that the "intruder must have had knowledge of the layout of the building, and about where this cash box had been stored."

[¶ 4.] Other officers joined Daughters and Olsen and assisted in the remainder of the search of Empire Plastics. After the search, Officer Daughters asked Edwards if he had any suspects in mind. Edwards responded that he had a good relationship with all his past and current employees except one, Michael Kottman. Edwards said that he had fired Kottman just five days earlier and that Kottman knew where the cash box was located because he had recently stocked the storage room. Thereafter, Daughters spoke with the foreman, Swier, who indicated that Kottman had worked for Empire Plastics for only two weeks. In addition, he "emphasized that [Kottman] had even said that he had a

'methamphetamine problem' and that he 'was a user.' "

[¶ 5.] In response to this information, Daughters went to his squad car and performed a preliminary background check on Kottman. The check revealed that Kottman was on parole and had previously been convicted of four burglaries and other theft crimes. When Daughters attempted to contact Kottman's parole agent, he was unable to reach him and instead spoke with another parole agent, John Schultz. During this conversation, Daughters confirmed that Kottman was on parole for burglary and theft convictions and as a condition of parole he had signed a search and seizure waiver. Then Daughters obtained the address Kottman reported as his residence and informed Schultz that he planned to "go to Kottman's residence and conduct a warrantless search of the premises and his vehicles." Because Daughters was familiar with the waiver provision in the parole supervision agreements, he did not obtain a copy of Kottman's agreement before conducting the search.

[¶ 6.] When the officers arrived at Kottman's home, his girlfriend, Shannon Weiss, let them inside, and then she went downstairs to get Kottman, who was showering. Thereafter, the officers explained to Kottman that they suspected him of burglarizing Empire Plastics and that they would be searching his home and vehicles. "Daughters began his search of the premises by going downstairs first to the basement section of [Kottman's] split-level home, which had four floors." He noticed that the shower had recently been used and that a pile of clothes were on the floor in the north-east bedroom. While in the bedroom, Daughters also noticed a "karate-type shirt" located about two feet

---

place of residence, vehicle and personal effects to search and seizure at any time, with or without a search warrant, whenever rea-

sonable suspicion is determined by a parole agent or law enforcement."

from the pile of clothes and it was "nicely rolled up." When he picked up the shirt, a glass methamphetamine pipe containing "a white powdery residue" rolled out onto the carpet. Daughters concluded that the bathroom and bedroom he had just searched belonged to Kottman, who was upstairs waiting with Officer Mike Iverson.

[¶ 7.] During the officers' search of the remainder of the home and all the vehicles, they did not find any other drugs or paraphernalia. However, they found and seized several items as possible evidence connecting Kottman to the burglary.[2] Kottman was thereafter charged with possession of methamphetamine and he moved to suppress the evidence because the officers did not have a warrant and there were no "exigent circumstances necessitating their entrance and search of [Kottman's] home." Kottman also claimed that the officers did not have enough information to conclude with reasonable suspicion that Kottman burglarized Empire Plastics.

[¶ 8.] His motion was denied, and, after a jury trial, he was convicted of possession of a controlled substance. Kottman appeals, claiming (1) the warrantless search of his home was illegal because it violated his Fourth Amendment right to be free from unreasonable searches and seizures, (2) the United States Supreme Court case, *U.S. v. Knights*, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001), does not apply and does not make this search reasonable because it violated the "stalking horse doctrine," and (3) if *Knights* applies, the

search was illegal because reasonable suspicion did not exist.

## Standard of Review

[¶ 9.] " 'A motion to suppress for an alleged violation of a constitutionally protected right raises a question of law, requiring de novo review.' " *State v. Hess*, 2004 SD 60, ¶ 9, 680 N.W.2d 314, 319 (quoting *State v. Herrmann*, 2002 SD 119, ¶ 9, 652 N.W.2d 725, 728). The circuit court's application of a legal standard is also reviewed de novo, while its factual findings are reviewed under the clearly erroneous standard. *Id.; State v. Ballard*, 2000 SD 134, ¶ 9, 617 N.W.2d 837, 840 (citations omitted).

## Analysis and Decision

[¶ 10.] Even though Kottman maintains that the officers needed a warrant to enter his home or that the entry without a warrant must have been supported by exigent circumstances, Kottman sacrificed substantial Fourth Amendment rights when he signed the supervision agreement as a condition of his parole. The constitutionality of these conditional waivers has previously been upheld by this Court. *See State v. Ashley*, 459 N.W.2d 828, 830 n. 1 (S.D. 1990); *State v. Cummings*, 262 N.W.2d 56, 61 (S.D.1978). Specifically, we recognized that "[a] probationer's expectations of privacy are less than those of the average citizen, and a condition of probation such as that imposed in [a conditional waiver] does not run afoul of [a probationer's] Fourth Amendment rights."[3] *Cummings*, 262

---

**2.** A lock box was seized but it could not be identified later as the one taken in the burglary. The State voluntarily dismissed the charge of third-degree burglary on June 11, 2004.

**3.** "Probation" and "parole" are used interchangeably, but we have not addressed whether there is a difference between parol-

ees or probationers. However, the Third Circuit stated that there

is "no constitutional difference between probation and parole for purposes of the fourth amendment." *United States v. Harper*, 928 F.2d 894, 896 n. 1 (9th Cir.1991) [ (citations omitted) ]. In fact, parole may be an even more severe restriction on liber-

N.W.2d at 61. Thus, the mere fact the officers searched Kottman's home without a warrant or exigent circumstances does not mean his Fourth Amendment rights were violated.

[¶ 11.] Nevertheless, Kottman insists that the existence of this conditional waiver does not negate the officers' violation of the stalking horse doctrine, which "prevents law enforcement officers from unfairly exploiting search and seizure waivers in probation and parole agreements to skirt Fourth Amendment rights." Kottman cites *Ashley*, where we adopted the stalking horse doctrine. 459 N.W.2d at 830. In further support, Kottman requests that we apply decisions from the District Court of South Dakota and Eighth Circuit Court of Appeals, which also recognized the doctrine. *See United States v. Scott*, 945 F.Supp. 205, 209 (D.S.D.1996) (stating "searches must be used for rehabilitative and security purposes and not as a mechanism for solving crimes and circumventing the proscriptions of the Fourth Amendment"); *United States v. McFarland*, 116 F.3d 316, 318 (8th Cir. 1997) (invalidating a parole search that was "nothing more than a ruse for a police investigation").

[¶ 12.] In response, the State asserts that "the United States Supreme Court's analysis in *U.S. v. Knights* supersedes *Ashley*." In *Knights*, the defendant signed a probationary agreement with waiver language almost identical to Kottman's supervision agreement. *See* 534 U.S. at 114, 122 S.Ct. at 589, 151 L.Ed.2d 497. Similar to Kottman's contention here, the defendant in *Knights* relied on a recognized distinction between a proba-

tion-related and an investigation-related search and moved to suppress the evidence because it was not probation related. *Id.* at 116, 122 S.Ct. at 590, 151 L.Ed.2d 497. But the conditional waiver mentioned nothing about a purpose requirement, and, as a result, the Supreme Court rejected the defendant's claim. *Id.* at 116–18, 122 S.Ct. at 590, 151 L.Ed.2d 497. Consequently, the Supreme Court refused to apply a purpose-related review and adopted a traditional Fourth Amendment analysis. *Id.* at 118–22, 122 S.Ct. at 590–91, 151 L.Ed.2d 497.

[¶ 13.] Even though Kottman's claims are similar, he insists that *Knights* does not apply and that this Court should continue to regard *Ashley* as the controlling authority. Kottman argues that *Knights* "should not reflect the law and policy in South Dakota with respect to parole searches" because South Dakota "acknowledges a higher degree of Fourth Amendment protection than that offered by the United States Constitution." *See State v. Opperman*, 247 N.W.2d 673, 675 (S.D.1976). First, Opperman's holding has been seriously curtailed. *State v. Hejhal*, 438 N.W.2d 820 (S.D.1989). Second, it is not sufficient to simply invoke *Opperman* with a suggestion that we interpret a provision in our State Constitution to grant a higher standard of protection than a similarly worded provision in the Federal Constitution. A bare disagreement with the United States Supreme Court's interpretation of the Federal Constitution "imparts no sound doctrinal basis to impose a contrary view under the pretext of separately interpreting our State Constitution. Our Constitution is more than just a device to

---

ty because the parolee has already been adjudged in need of incarceration. *See United States v. Cardona*, 903 F.2d 60, 63 (1st Cir.1990), *cert denied*, 498 U.S. 1049, 111 S.Ct. 758, 112 L.Ed.2d 778 (1991).

*United States v. Hill*, 967 F.2d 902, 909 (3d Cir.1992). *See also United States v. Williams*, 417 F.3d 373, 376 n. 1 (3d Cir. 2005).

reject or evade federal decisions...." *State v. Schwartz,* 2004 SD 123, ¶ 34, 689 N.W.2d 430, 438 (Konenkamp, J., concurring). Counsel advocating a separate constitutional interpretation "must demonstrate that the text, history, or purpose of a South Dakota constitutional provision supports a different interpretation from the corresponding federal provision." *Id.* ¶ 57. No such analysis was presented here.

[¶ 14.] We think it significant that after *Knights* the Eighth Circuit Court of Appeals, and most other appellate courts, rejected the previously accepted stalking horse doctrine. *United States v. Brown,* 346 F.3d 808, 810 (8th Cir.2003).[4] In particular, the Eighth Circuit agreed that a traditional Fourth Amendment analysis would sufficiently balance "the degree to which a search intrudes upon an individual's reasonable expectation of privacy against the degree to which the government needs to search to promote legitimate interests." *Id.* at 811 (citing *Knights,* 534 U.S. at 119, 122 S.Ct. at 591,

151 L.Ed.2d 497).[5] This Court has already applied a Fourth Amendment balancing test and upheld the constitutionality of these conditional waivers when the search was probation related. *See Cummings,* 262 N.W.2d at 61; *Ashley,* 459 N.W.2d at 830 n. 1. And today we align ourselves with those courts that have decided in the wake of *Knights* that the Supreme Court's traditional Fourth Amendment analysis precludes the continued viability of the stalking horse doctrine. *See, supra* n. 4. Today, we overrule *Ashley's* adoption of this doctrine.

[¶ 15.] Because the stalking horse doctrine no longer applies, we are left to evaluate Kottman's claim that the officers did not have reasonable suspicion to justify the search.[6] What showing must be made by parole agents and law enforcement officers to uphold a warrantless search and seizure under a conditional waiver requiring a threshold determination of reasonable suspicion? This Court has not yet addressed this question, and a review of *Knights* and the Eighth Circuit's

4. *See, e.g., Williams,* 417 F.3d at 377–78 (specifically adopting *Knights* and rejecting claims under stalking horse doctrine); *United States v. Wilson,* 105 Fed.Appx. 498 (4th Cir.2004) (unpublished) (holding only reasonable suspicion is required for search under conditional waiver as a result of *Knights* ); *United States v. Keith,* 375 F.3d 346 (5th Cir.2004) (adopting the theory that *Knights* removes the distinction between parole and investigatory related searches); *United States v. Loney,* 331 F.3d 516 (6th Cir.2003) (stating *Knights* removed the requirement to consider purpose behind search when conditional waiver exists); *United States v. Hagenow,* 423 F.3d 638 (7th Cir.2005) (recognizing *Knights* and rejecting the requirement for special need to search without a warrant); *Brown,* 346 F.3d at 810 (rejecting the stalking horse doctrine); *United States v. Stokes,* 292 F.3d 964 (9th Cir.2002) (approving *Knights* invalidation of the claim the search was a "subterfuge for a criminal investigation"); *United States v. Tucker,* 305 F.3d 1193 (10th Cir.2002) (recog-

nizing the validity of a search because it was reasonable under the Fourth Amendment); *United States v. Yuknavich,* 419 F.3d 1302 (11th Cir.2005) (holding only reasonable suspicion is required as a result of *Knights* ).

5. The Court in *Knights* recognized that "[t]he touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.' " 534 U.S. at 119, 122 S.Ct. at 591, 151 L.Ed.2d 497 (quoting *Wyoming v. Houghton,* 526 U.S. 295, 300, 119 S.Ct. 1297, 1300, 143 L.Ed.2d 408 (1999)).

6. The language of Kottman's conditional waiver requires reasonable suspicion and Kottman is not claiming that probable cause or reasonable cause should be required before a warrantless search can be conducted.

analysis in *Brown* provide little guidance because the parties in those cases conceded the existence of reasonable suspicion. *See* 534 U.S. at 122, 122 S.Ct. at 593, 151 L.Ed.2d 497; 346 F.3d at 812.[7] In addition, relatively few state or federal courts have specifically addressed the question of what constitutes reasonable suspicion as applied to these conditional waivers in the wake of *Knights*. However, those courts that have answered the question largely chose to apply the reasonable suspicion standard as defined in investigatory stop cases.[8] After reviewing the case law, we conclude that the determination of reasonable suspicion in this case should be

7. While it is true the Eighth Circuit used *Knights'* "traditional Fourth Amendment balancing test to determine the search's constitutionality," it did so in order to reject the distinction between probation and investigatory related searches and not to define what constitutes reasonable suspicion. *Brown*, 346 F.3d at 811–12.

8. For example, when the North Dakota Supreme Court modified its method of review for the validity of probationary searches after *Knights*, it applied a reasonable suspicion standard adopted from its investigatory and traffic stop cases. *See State v. Maurstad*, 2002 ND 121, ¶ 35, 647 N.W.2d 688, 697 (requiring an "objective manifestation to suspect the defendant was, or was about to be, engaged in unlawful activity") (citing *City of Devils Lake v. Lawrence*, 2002 ND 31, ¶ 8, 639 N.W.2d 466, 469; *City of Fargo v. Ovind*, 1998 ND 69, ¶ 9, 575 N.W.2d 901, 903–04).

New Mexico also applied a reasonable suspicion standard based on its previous decisions in investigatory stop cases. *See State.v. Baca*, 135 N.M. 490, 90 P.3d 509, 521–22 (App.2004) (citing *State v. Urioste*, 2002–NMSC–023, 132 N.M. 592, 52 P.3d 964 (requiring "articulable facts that … would lead a reasonable person to believe criminal activity occurred or was occurring")); *State v. Galvan*, 90 N.M. 129, 560 P.2d 550, 552 (App. 1977).

Similarly, the Supreme Court of Illinois aligned its reasoning with an investigatory stop case. *See People v. Lampitok*, 207 Ill.2d 231, 278 Ill.Dec. 244, 798 N.E.2d 91, 106–07 (2003) (requiring " 'articulable facts which, taken together with the rational inferences from those facts, … warrant a reasonably prudent officer' to investigate further") (quoting *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990)); *People v. Scott*, 148 Ill.2d 479, 171 Ill.Dec. 365, 594 N.E.2d 217 (1992).

In contrast, Pennsylvania and New Jersey applied specific statutes which defined reasonable suspicion under warrantless searches based on conditional waivers. *See Commonwealth v. Moore*, 805 A.2d 616, 621 (Pa.Super.2002) (citing 61 PA. STAT. ANN. 331.27b(d)(6)); *State v. Maples*, 346 N.J.Super. 408, 788 A.2d 314, 316 (2002) (citing N.J. STAT. ANN. 10A:26–1.3). But the court in Pennsylvania also referred to investigatory stop cases when reviewing the adequacy of reasonable suspicion under the circumstances. *See Moore*, 805 A.2d at 621 (citing *Commonwealth v. Wimbush*, 561 Pa. 368, 750 A.2d 807 (2000); *Commonwealth v. Lohr*, 715 A.2d 459, (Pa.Super.1998); *Commonwealth v. Tate*, 237 Pa.Super. 104, 346 A.2d 570 (1975)).

In addition to state courts, a review of the federal courts reveals that most circuits also adopted a reasonable suspicion standard derived from previous investigatory stop cases. *Williams*, 417 F.3d at 376 (requiring "a particularized and objective basis for suspecting legal wrongdoing") (quoting *United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)); *Wilson*, 105 Fed.Appx. 498 (unpublished) (same as Third Circuit); *Loney*, 331 F.3d at 520 (requiring " 'articulable reasons' and 'a particularized and objective basis' ") (quoting *United States v. Payne*, 181 F.3d 781, 788 (6th Cir.1999) (quoting *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981))); *Hagenow*, 423 F.3d at 642 (requiring "something less than probable cause but more than a hunch") (quoting *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir.2005)); *Tucker*, 305 F.3d at 1200–01 (requiring "a particularized and objective basis for suspecting criminal activity") (citing *United States v. Treto–Haro*, 287 F.3d 1000, 1004 (10th Cir.2002); *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989); *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990)).

analyzed under the same standard for reasonable suspicion in investigatory stop cases.

[¶ 16.] Here, the circuit court found that the circumstances supported the existence of reasonable suspicion based on the information the officers obtained and the inferences the officers could have reasonably drawn. Even though the trial court's findings are reviewed under the clearly erroneous standard, "[i]t is our duty to make our own legal assessment of the evidence to decide under the Fourth Amendment whether the officers' actions were 'objectively reasonable.'" *State v. Chavez*, 2003 SD 93, ¶ 49, 668 N.W.2d 89, 103 (Konenkamp, J., concurring); *State v. Lamont*, 2001 SD 92, ¶ 21, 631 N.W.2d 603, 610. *See also Hess*, 2004 SD 60, ¶ 9, 680 N.W.2d at 319 (citing *State v. Almond*, 511 N.W.2d 572, 573–74 (S.D.1994)). "In deciding whether particular facts give rise to an objectively reasonable suspicion the officer must have more than 'an inchoate and unparticularized suspicion or "hunch,"' but less than the level of suspicion required for probable cause.'" *Ballard*, 2000 SD 134, ¶ 13, 617 N.W.2d at 841 (quoting *State v. Anderson*, 258 Neb. 627, 605 N.W.2d 124, 132 (2000)).

[¶ 17.] Kottman claims that "[i]t is difficult to believe that [his] parole status and prior employment justified *individualized* suspicion ... to such a high degree that law enforcement could forgo the inconvenience of investigating further and simply raid [Kottman's] home." However, reasonable suspicion does not implicate the individualized suspicion required under ordinary Fourth Amendment analysis. *See State v. Hirning*, 1999 SD 53, ¶ 13, 592 N.W.2d 600, 604 (identifying a requirement of individualized suspicion when describing the standard for probable cause). Instead, we are presented with a situation where Kottman expressly agreed to limit his

rights under the Fourth Amendment by accepting early release on parole from the penitentiary, with the condition that parole agents and law enforcement officers would have the power to search without a warrant as long as there is reasonable suspicion. Imposing this limitation does "not run afoul of [Kottman's] Fourth Amendment rights." *Cummings*, 262 N.W.2d at 61.

[¶ 18.] Thus, we review the particular facts surrounding the officers' actions and determine whether they support an "objectively reasonable suspicion" that Kottman burglarized Empire Plastics. *See Ballard*, 2000 SD 134, ¶ 13, 617 N.W.2d at 841. In this case, the officers arrived four minutes after the alarm sounded and no perpetrators were in the structure or nearby. Only one motion sensor was activated, even though there were several located throughout the building. The circuit court found that this information could reasonably lead the officers to believe that "the person who stole [the cash box] must have had knowledge of its exact location in order to enter, locate, remove it and depart the premises in less than four minutes," and that the "person who entered the building must have had knowledge of where the motion sensor alarms were positioned and had gone directly to where the cash box was hidden."

[¶ 19.] The officers were able to identify a suspect after they spoke with the owner and learned that Empire Plastics had a good working relationship with all its past and current employees, except Kottman. The officers' suspicion was strengthened when they learned that Kottman knew where the cash box was located and had been fired only five days earlier. Further, Officer Daughters performed a background check and learned that Kottman "was a multiple previously convicted felon including convictions for offenses

such as burglary and grand theft and that [he] was then released from the Penitentiary on parole supervision." With these facts, the circuit court ruled that the officers had reasonable suspicion to search Kottman's home. We conclude that the officers' knowledge based on their investigation "taken together with rational inferences" constitutes reasonable suspicion under these circumstances. *See State v. Lockstedt,* 2005 SD 47, ¶ 19, 695 N.W.2d 718, 723 (citations omitted).

[¶ 20.] Affirmed.

[¶ 21.] GILBERTSON, Chief Justice, and SABERS, ZINTER and MEIERHENRY, Justices, concur.