275 Neb. 369
DONELLE GIBOO, APPELLANT,
v.
CERTIFIED TRANSMISSION REBUILDERS, APPELLEE.
No. S-07-139.
Supreme Court of Nebraska.
Filed April 4, 2008.
James E. Harris and Britany S. Shotkoski, of Harris Kuhn Law Firm, L.L.P., for appellant.
Timothy E. Clarke and Amanda A. Dutton, of Baylor, Evnen, Curtiss, Grimit & Witt, L.L.P., for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
HEAVICAN, C.J.

I. INTRODUCTION
Donelle Giboo filed this action against Certified Transmission Rebuilders (CTR) of Omaha, Nebraska, seeking medical expenses and future compensation for injuries she suffered when she slipped on a set of stairs while working for CTR. At trial, the Nebraska Workers' Compensation Court adopted the assessment of the court-appointed vocational expert despite conflicting testimony by Giboo's own expert. On appeal, a divided panel of the Nebraska Workers' Compensation Court affirmed. Giboo now appeals to this court. We reverse and remand for reasons set forth below.

II. BACKGROUND
On July 25, 2002, Giboo, a CTR employee, slipped and fell while descending a flight of stairs at CTR's Omaha location. Giboo was 7 months' pregnant at the time. The fall aggravated a preexisting injury to Giboo's spine and ultimately required several surgeries to repair. On September 9, Giboo filed a petition in the Nebraska Workers' Compensation Court to obtain medical expenses as well as future compensation to offset diminished earning capacity. After a trial, the compensation court entered an award on May 21, in which CTR was ordered to pay medical expenses Giboo had incurred to that date. Moreover, based on the finding that Giboo was "temporarily totally disabled," the court ordered CTR to pay Giboo $267.62 per week in compensation.
On December 7, 2004, Giboo's physician, Dr. Randall Woodward, advised Giboo that she could return to work, but only if she observed several restrictions on her range of motion and the amount of weight she could lift or carry. Moreover, Woodward limited Giboo to a 6-hour workday, though he believed that she would eventually be able to work a full 8-hour workday. CTR accommodated these restrictions and continued to employ Giboo.
Giboo and CTR agreed that David Utley, a vocational rehabilitation expert, would serve as the vocational rehabilitation counselor assigned to the case. In a report dated July 18, 2005, Utley determined that Giboo had sustained a 25-percent loss of access to jobs in the Omaha and Council Bluffs, Iowa (Omaha/Council Bluffs), labor market. Utley concluded that for someone of Giboo's training and experience, this resulted in a 30-percent reduction in earning capacity in the Omaha/Council Bluffs labor market.
However, on September 28, 2005, Dr. James Devney, a colleague of Woodward, determined that Giboo should be permanently limited to no more than 6 hours of work per day. Additionally, Devney determined that Giboo had long since reached her Imlaximum medical improvement" and that her condition would not improve from that point forward. CTR terminated Giboo's employment shortly thereafter.
In response to the new 6-hour-workday limitation, Utley issued an amended evaluation of Giboo's earning capacity on October 3, 2005. Notably, Utley did not modify his prior conclusion that Giboo's disability reduced her access to jobs in Omaha/Council Bluffs by 25 percent. Utley did, however, increase his assessment of Giboo's loss of earning capacity from 30 to 35 percent.
On August 23, 2005, CTR filed a petition in the Nebraska Workers' Compensation Court to modify Giboo's prior award. Giboo and CTR agreed on most points, but disagreed on the extent of Giboo's lost earning capacity in light of her disabilities. At this second trial, Giboo presented evidence that she had since moved from the Omaha area to Dunlap, Iowa, a small, rural community of approximately 600 residents some 50 miles east of Omaha. Giboo testified that she made the move to live with the father of her child, since he owned a home in Dunlap. Giboo also presented testimony from Paulette Freeman, another vocational rehabilitation expert. Freeman testified that in her opinion, Utley had underestimated Giboo's loss of access to employment.
The court issued its order on February 10, 2006. In its order, the trial court discounted Freeman's testimony for reasons that we develop more fully below. The court then concluded that the statutory presumption in favor of Utley's assessment, as the assessment of the court-appointed vocational expert, had not been overcome. Therefore, the court adopted Utley's assessment and concluded that Giboo suffered from a 35-percent loss of earning capacity. Accordingly, the court adjusted Giboo's compensation to $93.67 per week for 1393/4 weeks.
Giboo petitioned for review by a three-judge panel of the Nebraska Workers' Compensation Court on February 23, 2006. On January 17, 2007, the three-judge panel affirmed the lower court's award by a vote of 2 to 1. Giboo now appeals the panel's decision affirming the trial court's award.

III. ASSIGNMENTS OF ERROR
Giboo assigns, restated, consolidated, and renumbered, that the trial court erred (1) in determining the relevant labor market from which to assess her earning capacity, (2) in upholding the statutory presumption in favor of Utley's appraisal of Giboo's earning capacity, and (3) in failing to issue a "reasoned decision" as required by the procedural rules governing the Nebraska Workers' Compensation Court.

IV. STANDARD OF REVIEW
[1] In determining whether to affirm, modify, reverse, or set aside the judgment of the three-judge panel of the Nebraska Workers' Compensation Court, an appellate court reviews the findings of the single judge who conducted the original hearing.[1]
[2,3] Determinations by a trial judge of the Workers' Compensation Court will not be disturbed on appeal unless they are contrary to law or depend on findings of fact which are clearly wrong in light of the evidence.[2] Regarding questions of law in workers' compensation cases, an appellate court is obligated to make its own determination.[3]

V. ANALYSIS

1. RELEVANT LABOR MARKET
[4,5] The predominant issue on appeal in this case is whether the trial court erred in selecting the relevant labor market from which to assess Giboo's earning capacity. Under Nebraska law, the amount an employer must pay a disabled employee in workers' compensation is based on that employee's earning capacity.[4] The factors used to assess a disabled employee's earning capacity include (1) eligibility to procure employment generally, (2) ability to hold a job obtained, (3) capacity to perform the tasks of the work, and (4) ability of the worker to earn wages in the employment in which he or she is engaged or for which he or she is fit.[5]
The factor assessing the ability to procure employment "in general" depends in part on the number and type of jobs available in a given market. Therefore, this factor might change depending on the location in question. For example, a major metropolitan area will have more jobs of a wider variety than a rural community.
Giboo lived and worked in the Omaha area at the time she was injured. However, after giving birth to her son in September 2002, Giboo began spending the majority of her time in Dunlap, where her child and the child's father reside. Giboo formally moved to Dunlap in September 2005. This case requires that we confront the question of what market to use to measure earning capacity when an employee, after suffering an injury while living and working in one community, relocates to a new community with fewer employment opportunities.
In its order, the trial court indicated this question had already been resolved by this court's prior opinion in Harmon v. Irby Constr. Co.[6] The trial court read Harmon as standing for the proposition that "the labor market in which the claimant was injured is the labor market in which the claimant's loss of earning capacity should be measured." This reading stretches Harmon too far.
In Harmon, an employee was injured while working for a company in Superior, Nebraska. The Nebraska Workers' Compensation Court found that Superior was the employee's exclusive labor market from which to assess his earning capacity. The employer appealed, claiming that the employee should be required to move to a larger labor market with more employment opportunities. This court disagreed and held that an employee "cannot be required to move to find employment."[7] But the conclusion that an employee cannot be forced to relocate in order to increase his or her earning capacity does not resolve the issue of where to measure earning capacity when an employee voluntarily relocates.
To resolve that question, it may be helpful to think of this issue as encompassing two separate inquiries. The first inquiry should ask which communityDunlap, Omaha/Council Bluffs, or bothshould serve as the "hub" area from which to assess Giboo's earning capacity. The second inquiry should address the other geographic areas that may be considered along with the hub community.

(a) "Hub" Community
[6] Courts and commentators uniformly agree that a "labor market" does not refer to a single community, but encompasses employment opportunities within a reasonable geographic area.[8] It would seem, therefore, that the first step in identifying a labor market is to identify "the hub from which the spokes of a `reasonable geographic area' radiate, whether it [is] from the place the injury occurred, the place the claimant resided at the time the injury occurred, or the place the claimant resides at the time of [the workers' compensation] hearing."[9]
In addressing the concept of the hub community as it relates to this case, we proceed in two parts. Drawing upon the parties' arguments, the first subpart surveys the approaches used by courts in other jurisdictions. In the second subpart, we identify the approach we think is preferable and apply it to the facts before us.

(i) Survey of Approaches Used in Other Jurisdictions
Without using the "hub" terminology, CTR essentially argues that both Omaha/Council Bluffs and Dunlap should serve as hub communities. CTR's position is that as a market with substantially fewer employment opportunities, using Dunlap as the hub community will lead to an exaggerated decrease in Giboo's earning capacity and thus a sharper increase in the amount of compensation CTR must pay. Instead, CTR urges us to adopt a rule under which the market where the injury occurred and any new market to which the claimant relocates are both regarded as hub communities. By keeping the injury market in the equation, CTR believes that such a rule would reduce the incentive for employees to "unilaterally manipulate" their earning capacity by moving to "poor or nonexistent labor markets in order to make themselves totally disabled, where they otherwise would not have been."[10]
CTR's proposition is based on the approach taken by the Idaho Supreme Court. In most situations, the Idaho Supreme Court regards "the market in which a claimant resides at the time of the hearing as the axis from which the scope of a `reasonable geographic area' is defined."[11] However, when an employee voluntarily relocates to a community with fewer employment opportunities, both the community where the injury occurred and the community to which the employee relocates are considered hub communities.[12] Like CTR, the Idaho Supreme Court reasoned that a claimant should not be permitted to manipulate his or her disability status, and thus the amount of compensation the employer must pay, simply "by changing his place of residence."[13]
Giboo argues that Dunlap alone is the hub community from which to base an assessment of her earning capacity. In support of this proposition, Giboo points out that there is no evidence that her move to Dunlap was based on improper motives, such as the desire to avoid work. Instead, Giboo argues the record supports the contention that her move was done for completely legitimate purposes.
In making such arguments, Giboo invokes a line of decisions from other jurisdictions which hold that the community to which a claimant relocates after an injury will serve as the relevant labor community, provided that the move was made for legitimate reasons.[14] However, even those courts disagree on what qualifies as a "legitimate" motive.
The First and Fourth Circuits have held that in most cases, only "economic" motives provide a sufficient justification for a claimant's decision to relocate to a new community after a vocational injury. In See v. Washington Metropolitan Area Transit Authority,[15] Elwood See relocated to Franklin, West Virginia, after he suffered a disability while living and working in Washington, D.C. The employer argued that using Franklin instead of Washington, D.C., as the labor market would mean employers' compensation obligations could be unilaterally manipulated by "'the claimant's personal choice to relocate to an area with fewer available jobs.'"[16]
In response, the Fourth Circuit held that "[t]he presence of a legitimate purpose influencing a post-injury relocation is a significant factor warranting consideration in the determination of the relevant labor market."[17] Regarding the definition of "legitimate," it is significant that the Fourth Circuit based its decision on the fact that "Where [was] substantial evidence supporting the economic reasons for See's move to West Virginia and the legitimacy of those reasons."[18] The court gave a clue as to its definition of "economic" when it held that a "move predicated on a legitimate intent to reduce an injured claimant's cost of living" would suffice.[19]
The First Circuit relied on See in Wood v. U. S. Dept. of Labor,[20] wherein Michael Wood relocated to Shortsville, New York, after being injured while working at a shipyard in Bath, Maine. Wood testified that his decision to move back to New York was prompted in part by a need to provide care to his ailing mother. The First Circuit acknowledged that "[c]are for an aged parent is to be commended," but nonetheless felt that the federal workers' compensation laws demanded an "economic" motive behind a claimant's relocation.[21]
In contrast to the First and Fourth Circuits, a number of state courts have indicated that a claimant's new community will serve as the relevant labor market so long as the claimant moved there in good faith. For example, in Kurrell v. National Con Rod, Inc.,[22] an employee injured while working in Minneapolis, Minnesota, subsequently relocated to Walnut Grove, Minnesota, a small town some 150 miles away. The claimant moved to Walnut Grove to be with her family. Although the Minnesota Supreme Court acknowledged that the claimant's "motivations in moving to Walnut Grove may be viewed as `merely personal," Walnut Grove was nonetheless the relevant labor market because the move there "was not part of a plan to retire from the labor market."[23]
In USAir, Inc. v. W.C.A.B. (Keene),[24] a claimant injured while working in Pittsburgh, Pennsylvania, relocated to Destrehan, Louisiana, after his wife was offered an additional $27,000 per year to take a job there. The employer argued that Pittsburgh should be the labor market for purposes of the earning capacity assessment because the "choice to move was a personal one, not prompted by any economic or other necessity."[25] The court disagreed and held that Destrehan would serve as the relevant community because "'the claimant ... resettled [there] under circumstances which do not indicate a lack of good faith in the move itself.'"[26]
Similarly, in Reede v. State, Dept. of Transp.,[27] a claimant injured while working in the Black Hills area in South Dakota relocated to Forsyth, Montana, a location with fewer employment opportunities. The claimant explained that she moved to Montana out of "financial necessity" and because she "has a good support network in that community."[28] The South Dakota Supreme Court held that a claimant's new residence will serve as the relevant labor market if the "claimant ... demonstrates that a change of community was done in good faith, and not for improper motives."[29] The court ultimately upheld the use of Forsyth as the labor market, based on the state department of labor's finding that the move to Forsyth was made for legitimate reasons.[30]
Finally, we note that the Florida Court of Appeals has suggested that the area to which "a claimant relocates after the injury" is the community from which to assess earning capacity, provided "there is no evidence that claimant's relocation following his injury was motivated by a desire to avoid work."[31]

(ii) Identifying Hub Community in Present Case
Having surveyed the various approaches other jurisdictions use to identify the hub community, we must now identify which approach we believe is preferable. There is no doubt that the Idaho Supreme Court's approach offers a good deal of protection to employers. That court's approach would reduce the incentive for claimants to distort the extent of their disability by relocating to an area with fewer job opportunities. Moreover, by factoring the original community into the earning capacity average, this approach would mitigate the impact of any attempt to manipulate earning capacity through relocation.
Nevertheless, we decline to adopt this approach because of the potential for unjust results. As CTR notes in its brief, the distance between the hub communitiesold and newis completely irrelevant under the Idaho Supreme Court's approach. As such, if a claimant was injured while working in Omaha and then relocates to Scottsbluff, Nebraska, his or her earning capacity would be based on the availability of employment opportunities in and around both cities. But we believe that adjusting a claimant's earning capacity based on employment opportunities that are not realistically available to the claimant would contravene the policy behind the Nebraska Workers' Compensation Act.
The primary purpose of that act is "restoration of the injured employee to gainful employment."[32] To that end, the act prescribes a number of steps that courts must take to accurately assess an employee's actual earning capacity. It would be odd, therefore, for us to adopt a rule which openly allows courts to distort the picture by factoring in employment opportunities that are clearly not practical.
Additionally, the Idaho Supreme Court's approach would force claimants to choose between legitimate opportunities to improve their personal or financial situations and their rights to receive much-needed compensation. As the cases surveyed above demonstrate, claimants may have any number of perfectly legitimate reasons for relocating to a new community after suffering an injury in their old community. A claimant may need to move to provide care for an aging or infirm family member or to maintain a cohesive family unit. Moreover, individuals with physical disabilities often find it necessary "to move back to communities where family members can lend support."[33] As the Minnesota Supreme Court noted in Kurrell, "hilt would be a harsh and rigid rule that allowed an employee to better her personal situation only at the expense of her statutory right to rehabilitation benefits."[34]
It seems, therefore, that the better rule is one which regards the employee's new community as the hub community provided that the move was made for legitimate reasons. Such a rule would avoid the policy pitfalls identified above and, by scrutinizing the legitimacy of the reasons behind the move, would screen out claimants whose moves are based on illegitimate purposes.
However, in adopting this approach, we do not believe it is necessary for the claimant to justify his or her relocation with a purely economic motive. We note that the Fourth Circuit indicated in See[35] that a lower cost of living in the new community would qualify as an economic motive. But given that smaller communitiesthat is, communities with fewer employment opportunitieswill frequently have a lower cost of living than larger communities, it is difficult to envision a situation in which a claimant's move to a small community could not be justified on an economic basis. In this way, the federal circuit's approach appears to offer more in theory than in practice.
Moreover, insisting on an economic justification would essentially punish those claimants who relocated for legitimate reasons that may not be "economic" in the strictest sense. For example, one can easily envision a single mother who, after suffering a work-related physical disability, must relocate to a community where family can assist with childcare. In such a hypothetical, the more significant factor is not the prospect of free childcare from family membersa potentially economic justificationbut, rather, the nature and quality of care that family would provide relative to complete strangers.
[7-9] Accordingly, we hold that when an employee injured in one community relocates to a new community, the new community will serve as the hub community from which to assess the claimant's earning capacity, provided that the "change of community was done in good faith, and not for improper motives."[36] Like the South Dakota Supreme Court, we believe the claimant carries the burden to establish that the move was made in good faith and not for the purpose of exaggerating the extent of his or her difficulty in finding suitable employment.[37] If the claimant cannot show a legitimate motive behind his or her postinjury relocation, the community where the claimant resided at the time the injury occurred will serve as the hub community.
There is significant evidence in the record to support the belief that Giboo's move was made in good faith and therefore that Dunlap should be the hub community from which to base an assessment of Giboo's earning capacity. Giboo testified at trial that her move to Dunlap was motivated solely by the desire to live with her son who was born in September 2002, shortly after Giboo's injury. Although she maintained her permanent residence in Plattsmouth, Nebraska, Giboo testified that she was in Dunlap "95 percent" of the time. Giboo formally established her residence in Dunlap in September 2005. When asked why it took so long to officially change her residence to Dunlap, Giboo explained that parole limitations prevented her from establishing a residence outside Nebraska until September 2005.
These facts suggest that Giboo's move to Dunlap was made in good faith and was not motivated by a desire to manipulate the extent of her disability. We acknowledge that the trial court's order lacks a conclusive finding in this regard. Nevertheless, we note that the trial court never discredited Giboo's testimony. Moreover, we note that CTR appeared to concede that Giboo's move was made in good faith when, in its brief before this court, it stated: "Further, [CTR] is not claiming that there is evidence that support[s] a conclusion that the move was made in a deliberate attempt to manipulate [Giboo's] labor market."[38] This comment is tantamount to a concession that Giboo's move was made for legitimate reasons in line with the rule we adopt today. It is therefore unnecessary to remand for the trial court to conduct findings on the motives behind Giboo's move. Accordingly, we conclude that Dunlap alone should serve as the hub community from which to assess Giboo's earning capacity.

(b) Impact of Employment Opportunities Around Hub Community
Having concluded that Dunlap is the hub community from which to assess Giboo's earning capacity, we must now address what other communities around Dunlap should factor into the calculation of Giboo's earning capacity.
[10] Once the hub community has been identified, authorities agree that a "labor market" includes not only that particular community, but also any communities within a reasonable geographic area around it. This concept is made explicit in a few state statutes[39] and is also a concept familiar to workers' compensation experts.[40]
At trial, Freeman, Giboo's vocational expert, testified that Dunlap should be the primary community from which to conduct an assessment of Giboo's earning capacity. Other areas including Omaha/Council Bluffsmay also factor into the calculation so long as it would be practical for Giboo to accept employment there. Freeman's testimony in this regard parallels the conclusions reached by courts from other jurisdictions.
In Kelly Services v. Industrial Comm'n,[41] the Arizona Court of Appeals addressed whether an employee who lived and worked in Yucca, Arizona, should be required to seek work in neighboring towns with greater employment opportunities. In particular, the employer argued that the claimant should be required to seek employment in either Kingman, Arizona, or Lake Havasu City, Arizona, towns 24 and 34 miles from Yucca, respectively. The court declined to adopt a bright-line rule either excluding or including those communities in the claimant's labor market. Instead, the court adopted a circumstantial reasonableness test under which areas in the vicinity of one's hub community would also be taken into consideration so long as "a reasonable person in the claimant's situation would probably seek employment there."[42] The court further noted that "[i]n making such a determination, a totality of the circumstances approach, in which all relevant factors are considered, should be used."[43] While not an exhaustive list, the court then explained that
relevant considerations in determining whether a potential job lies within a person's geographical labor market area would typically include [(1)] availability of transportation, [(2)] duration of commute, and [(3)] length of workday .... It would also include [(4)] the ability of the person to make the commute based on his physical condition.'[44]
The Pennsylvania Supreme Court uses the same approach as the Arizona Court of Appeals, but also places some weight on whether the particular geographic area outside the hub community is an "'area where others [from] the same community would accept employment.'"[45]
These standards essentially mirror the testimony of Freeman, who also emphasized that Giboo's 6-hour-workday limitation and potential inability to make a long commute should be considered when evaluating the relevance of areas around Dunlap. Freeman also emphasized one additional factor which the Arizona Court of Appeals and Pennsylvania Supreme Court did not specifically touch upon: the amount of wages the claimant could expect to earn in the prospective community. As Freeman testified, it would be impractical for an individual to make a 2-hour roundtrip each day to Omaha/Council Bluffs for jobs which pay only $6 per hour.
[11, 12] We agree with the above and therefore hold that communities surrounding the claimant's hub community should be considered part of the claimant's labor market, but only to the extent that it would be reasonable for the claimant to seek work in that location. This reasonableness determination should be based on the totality of the circumstances, with regard for such factors as (1) availability of transportation, (2) duration of the commute, (3) length of the workday the claimant is capable of working, (4) ability of the person to make the commute based on his or her physical condition, and (5) economic feasibility of a person in the claimant's position working in that location. Regard might also be given to the more generalized inquiry of whether others who live in the claimant's hub community regularly seek employment in the prospective area.
[13-151 Nebraska law contemplates that court-appointed vocational rehabilitation experts will help courts identify vocational rehabilitation plans and apply the statutory factors used to assess disabled employees' earning capacities.[46] The above factors should be used by courtsand the court-appointed vocational experts guiding themwhen selecting the relevant areas to use in setting a claimant's vocational rehabilitation plan and loss of earning capacity. Of course, the opinion of the courtappointed expert is given a rebuttable presumption of validity[47] and a party who disagrees with that opinion has the burden to show that it is inaccurate.[48] Obviously, the rebuttable presumption in favor of the court-appointed expert's opinion can be rebutted by a showing that his or her assessment was predicated on principles that are contrary to law. So, for example, a claimant would have the burden to show that in conducting his or her assessment, the court-appointed expert incorrectly considered an area around the hub community where employment opportunities are not reasonably available to the claimant. Similarly, an employer would have the burden to show that in conducting his or her assessment, the court-appointed expert incorrectly omitted an area near the hub community where employment opportunities are reasonably available to the claimant.
Based on the preceding discussion, it is possible that the Omaha/Council Bluffs may be taken into account in assessing Giboo's earning capacity. However, any consideration of Omaha/Council Bluffs would be based on its proximity to Dunlapapproximately 50 milesnot by virtue of the fact that Omaha/Council Bluffs was the community where Giboo lived and worked at the time of her vocational injury.

2. STATUTORY PRESUMPTION IN FAVOR OF UTLEY'S ASSESSMENT
Giboo also challenges the trial court's decision to adopt the assessment of Utley, the court-appointed vocational expert. Giboo believes Utley erroneously concluded that Giboo suffered a mere 35-percent reduction in her earning capacity as a result of her injuries. Accordingly, Giboo believes the court erred in adopting Utley's assessment.
[16] As noted above, Nebraska law provides that trained vocational experts will help workers' compensation courts handle compensation claims by disabled employees.[49] While the opinion of the court-appointed expert is given a rebuttable presumption of validity,[50] a party who disagrees with the expert's conclusions may overcome this presumption by showing that those conclusions are inaccurate.[51] Again, one way of showing the inaccuracy of a court-appointed expert's opinion is to demonstrate that the opinion is based on assumptions which run contrary to law. A party can also show that the opinion of the court-appointed expert is inaccurate by offering proof that the nonexistence of a fact presumed by the court-appointed expert is more probable than is its existence.[52] As the Nebraska Court of Appeals has observed, a party might carry his or her burden by, among other things, presenting the testimony of his or her own vocational expert.[53]

(a) Improper Focus on Labor Market
Giboo claims that Utley failed to give due consideration to Dunlapand overly emphasized Omaha/Council Bluffsin conducting his assessment of Giboo's earning capacity. At trial and during oral argument before this court, counsel for CTR insisted that Utley considered both the Omaha/Council Bluffs and Dunlap communities in conducting his assessment of Giboo's earning capacity. However, this suggestion runs counter to Utley's reports admitted into evidence.
In his report dated July 18, 2005, Utley states, "After developing... Giboo's vocational profile and eliminating occupations that would not be compatible with these restrictions, her loss of access to suitable jobs in the Omaha/Council Bluffs labor market was determined to be approximately 25%." (Emphasis supplied.) Later in that same report, Utley noted that wage surveys for jobs suited to Giboo pay "in the range of $268.00 per week to $530.00 per week in the Omaha/Council Bluffs labor market. (Emphasis supplied.) Utley's report concludes in the following manner: "This opinion is expressed with a reasonable degree of vocational certainty and is based upon ... Giboo's... access to jobs in the Omaha/Council Bluffs labor market area." (Emphasis supplied.)
Dunlap was not referenced in the body of the report. Utley only referenced Dunlap at the very beginning of his report where he listed Giboo's current residence as "Dunlap, IA." Utley's second report, issued after Giboo was limited to a 6-hour workday, is identical to the first report in these respects.
These statements certainly support the belief that Utley considered only Omaha/Council Bluffs in conducting his assessment of Giboo's earning capacity. At a minimum, the repetitive use of "Omaha/Council Bluffs" as the labor market indicates that Utley regarded Omaha/Council Bluffs as the primary community rather than Dunlap. It appears Utley's approach to the labor market issue conflicts with our holding that Dunlap is the hub community. Utley should have used Dunlap as the hub community and only considered Omaha/Council Bluffs if doing so would be reasonable under the circumstantial factors set forth earlier. Because Utley apparently did not do either of these things, his assessment is predicated on principles which are contrary to law.

(b) Failure to Adjust Giboo's Loss of Access
Giboo also challenges the accuracy of Utley's ultimate assessment of the extent of Giboo's diminished earning capacity. In his report dated July 18, 2005, Utley concluded that Giboo had suffered a 25-percent loss of access to jobs and a 30-percent reduction in earning capacity overall. After Giboo's physician limited her to a 6-hour workday, Utley amended his earning capacity assessment from a 30-percent reduction to a 35-percent reduction. However, his loss of access estimate remained at 25 percent.
Utley's failure to adjust his assessment of Giboo's loss of access despite her 6-hour-workday limitation suggests that Utley did not believe that such a limitation would reduce her access to jobs. But it simply cannot be true that a worker who is permanently limited to a maximum of 6 hours of work per day will have the same access to jobs as a worker with no such limitation. In fact, this very case demonstrates that fact. The record shows that CTR went out of its way to accommodate Giboo's numerous movement and weight-bearing limitations after her accident and even reassigned her to different positions of employment in order to keep her on staff. However, when Giboo was permanently limited to a 6-hour workday by her physicians, even CTR could not bring itself to accommodate this limitation and Giboo's employment was terminated. Therefore, Utley's assumption that a 6-hour-workday limitation would not affect Giboo's access to jobs is not accurate. As a result, the numerical conclusions which depended upon that assumption must also be inaccurate under the principles we outlined above.
That Utley changed his assessment of Giboo's earning capacity from a 30-percent reduction to a 35-percent reduction does not save his assessment. All other things being equal, a person who can work no more than 6 hours per day will obviously earn less than an individual with no such limitation. Utley's conclusion that Giboo's 6-hour-workday limitation resulted in an additional 5-percent reduction in her overall earning capacity merely reflects this basic fact. But such a limitation would also reduce a person's earning capacity by virtue of the fact that it reduces the number of jobs available to that individual.
Freeman, Giboo's own vocational expert, testified in support of those points. While she did not prepare an earning capacity report of her own, Freeman indicated that such a report was not necessary for her to determine that Utley's assessment was erroneous. The trial court discounted Freeman's testimony based on the court's erroneous belief that Freeman did not think employment opportunities in Omaha/Council Bluffs were relevant. This conclusion is clearly erroneous.
During cross-examination by counsel for CTR, Freeman was asked whether she thought it was appropriate to consider both Dunlap and Omaha/Council Bluffs in the earning capacity analysis. Freeman gave a qualified answer in which she stated that consideration of employment opportunities in Omaha/Council Bluffs would depend on whether it was practical for Giboo to take the particular job. Freeman referenced such considerations as the amount of wages and length of commute.
Shortly thereafter, Freeman was asked the same question by counsel for CTR. This time, Freeman seemed to indicate that employment opportunities in Omaha/Council Bluffs should not be considered at all. However, Freeman immediately retracted the statement and stated that she did not understand counsel's question. Counsel promised to pose the question again, but did not. Nevertheless, on no less than five subsequent occasions, Freeman testified that although jobs in Omaha/Council Bluffs might be relevant, it would depend on several circumstantial factors. On at least one of these occasions, Freeman's answer came in response to a question from the bench. In light of Freeman's repetitive statements, the court clearly erred in concluding that Freeman did not think jobs in Omaha/Council Bluffs were relevant. As such, the court erred in discounting the importance of Freeman's testimony. Rather than present an inaccurate view of the relevant issues, Freeman's prescient testimony actually mirrored the two-part approach we adopt today.
In sum, it is clear that Utley's assessments of Giboo's earning capacity contain several errors. The assessments not only depend on an incorrect understanding of the labor market issue, they also present calculations that depend on demonstrably false assumptions. As a result, the trial court erred by relying on Utley's assessments over Freeman's contrary testimony.

3. RULE 11 CLAIM
In her final assignment of error, Giboo argues that the trial court violated Workers' Comp. Ct. R. of Proc. 11A (2006) by failing to issue a "reasoned decision." At the time, rule 11 provided:
A. Reasoned Decisions. All parties are entitled to reasoned decisions which contain findings of fact and conclusions of law based upon the whole record which clearly and concisely state and explain the rationale for the decision so that all interested parties can determine why and how a particular result was reached. The judge shall specify the evidence upon which the judge relies. The decision shall provide the basis for a meaningful appellate review.
Rule 11 provides that lower court decisions must facilitate appellate review. Although the trial court's order was somewhat ambiguous at times, it nonetheless provided the basis for meaningful appellate review. The trial court made conclusions of law regarding the labor market issue. It also concluded that Giboo suffered a 35-percent reduction in her earning capacity due to her disability and cited Utley's report as the basis for that conclusion. The court considered and rejected the testimony by Freeman. This assignment of error is without merit.

VI. CONCLUSION
We conclude that Dunlap should serve as the hub community from which to assess Giboo's earning capacity. This conclusion is premised upon evidence in the record which tends to show that Giboo had a good-faith basis to move from Omaha to Dunlap, as well as CTR's concession that no contrary evidence exists regarding Giboo's motive. However, we nonetheless find it necessary to reverse the order of the compensation court review panel with directions to remand the cause to the trial court to determine the exact value of Giboo's earning capacity in light of her disability and new place of residence.
Because Utley did not regard Dunlap as the hub community and failed to adjust Giboo's loss of access figure, his opinion is not entitled to any presumption of correctness on remand. Rather, the trial court's assessment of Giboo's earning capacity should be based on all the evidence in the record, as well as additional evidence offered by the parties and evidence presented by Freeman. Finally, the trial court is to rely on the totality of the circumstances when considering whether any communities around Dunlap should factor into the assessment of Giboo's earning capacity.
REVERSED AND REMANDED WITH DIRECTIONS.
NOTES
[1] See Wilson v. Larkin & Sons, 249 Neb. 396, 543 N.W.2d 735 (1996).
[2] See McBee v. Goodyear Tire & Rubber Co., 255 Neb. 903, 587 N.W.2d 687 (1999).
[3] See Hobza v. Seedorff Masonry, Inc., 259 Neb. 671, 611 N.W.2d 828 (2000).
[4] Neb. Rev. Stat. § 48-121 (Reissue 2004); Davis v. Goodyear Tire & Rubber Co., 269 Neb. 683, 696 N.W.2d 142 (2005).
[5] See Davis, supra note 4.
[6] Harmon v. Irby Constr. Co., 258 Neb. 420, 604 N.W.2d 813 (1999).
[7] Id. at 428, 604 N.W.2d at 820.
[8] See, e.g., Kelly Services v. Industrial Cotn'n, 210 Ariz. 16, 106 P.3d 1031 (Ariz. App. 2005).
[9] Davaz v. Priest River Glass Co., Inc., 125 Idaho 333, 336, 870 P.2d 1292, 1295 (1994).
[10] Brief for appellee at 19.
[11] Davaz, supra note 9, 125 Idaho at 338, 870 P.2d at 1297.
[12] See Lyons v. Industrial Special Indetn. Fund, 98 Idaho 403, 565 P.2d 1360 (1977), cited with approval, Davaz, supra note 9. Cf. Paratno v. Industrial Cotn'n of Arizona, 186 Ariz. 75, 918 P.2d 1093 (Ariz. App. 1996).
[13] Lyons, supra note 12, 98 Idaho at 407 n.3, 565 P.2d at 1364 n.3.
[14] See, e.g., Reede v. State, Dept. of Transp., 620 N.W.2d 372 (S.D. 2000).
[15] See v. Washington Metropolitan Area Transit Authority, 36 F.3d 375 (4th Cir. 1994).
[16] Id. at 382.
[17] Id.
[18] Id. at 383 (emphasis supplied).
[19] Id. at 382.
[20] Wood v. U.S. Dept. of Labor, 112 F.3d 592 (1st Cir. 1997).
[21] Id. at 597.
[22] Kurrell v. National Con Rod, Inc., 322 N.W.2d 199 (Minn. 1982).
[23] Id. at 202.
[24] USAir, Inc. v. W.C.A.B. (Keene), 706 A.2d 888 (Pa. Commw. 1998).
[25] Id. at 889.
[26] Id. at 890.
[27] Reede, supra note 14.
[28] Id. at 374.
[29] Id. at 376.
[30] Reede, supra note 14.
[31] Genelus v. Boran, Craig, Schreck Const. Co., 438 So. 2d 964, 966 (Fla. App. 1983).
[32] Neb. Rev. Stat. § 48-162.01 (Cum. Supp. 2006).
[33] Wood, supra note 20, 112 F.3d at 596.
[34] Kurrell, supra note 22, 322 N.W.2d at 202.
[35] See, supra note 15.
[36] See Reede, supra note 14, 620 N.W.2d at 376.
[37] See id.
[38] Brief for appellee at 20.
[39] Idaho Code Ann. § 72-430 (2006), construed in Combs v. Kelly Logging, 115 Idaho 695, 769 P.2d 572 (1989); S.D. Codified Laws § 62-4-52(1) (2004).
[40] 4 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 84.01(4) (2007).
[41] Kelly Services, supra note 8.
[42] Id. at 20, 106 P.3d at 1035.
[43] Id.
[44] Id. (citations omitted). See, also, Litzinger v. W.C.A.B. (Builders Transp.), 731 A.2d 258 (Pa. Commw. 1999).
[45] Dilkus v. W.C.A.B., 543 Pa. 392, 399, 671 A.2d 1135, 1139 (1996).
[46] See § 48-162.01(3).
[47] See id.
[48] See Dawes v. Wittrock Sandblasting & Painting, 266 Neb. 526, 667 N.W.2d 167 (2003), disapproved in part on other grounds, Kitntninau v. Uribe Refuse Serv., 270 Neb. 682, 707 N.W.2d 119 (2005).
[49] See § 48-162.01(3).
[50] See id.
[51] Dawes, supra note 48.
[52] Id.
[53] See, Romero v. IBP, inc., 9 Neb. App. 927, 623 N.W.2d 332 (2001); Stansbury v. HEP, Inc., 3 Neb. App. 712, 530 N.W.2d 284 (1995), reversed on other grounds 248 Neb. 706, 539 N.W.2d 28. See, also, Cords v. City of Lincoln, 249 Neb. 748, 545 N.W.2d 112 (1996).