748 N.W.2d 49 (2008)
275 Neb. 602
Christine M. MONEY, appellee,
v.
Tyrrell FLOWERS and Continental Western Group, appellants.
No. S-07-681.
Supreme Court of Nebraska.
May 2, 2008.
*55 Dallas D. Jones and Amanda A. Dutton, of Baylor, Evnen, Curtiss, Grimit & Witt, L.L.P., Lincoln, for appellants.
Jeffry D. Patterson, of Bartle & Geier Law Firm, Lincoln, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
CONNOLLY, J.
The appellee, Christine M. Money, suffered an injury while working for Tyrrell Flowers in Lincoln, Nebraska. Afterward, she moved 75 miles away to Table Rock, Nebraska. This appeal presents two issues. First, in determining Money's loss of earning power, did the trial judge err by excluding Lincoln and finding that the relevant labor market was the Table Rock community? Second, did the trial judge err in finding that Money was totally and permanently disabled as an odd-lot worker? We conclude that the trial judge correctly decided both issues.

I. EMPLOYER'S CONTENTIONS
Tyrrell Flowers and Continental Western Group (collectively Tyrrell) contend a court must consider two labor markets when a worker voluntarily moves from a large labor market to a small labor market after sustaining a compensable injury. That is, it contends the court must assess a worker's loss of earning power in relation to both the labor market where the worker was injured and the labor market to which the worker moved in good faith. Otherwise, Tyrrell argues that the worker will be able to manipulate his or her loss of earning power by moving to an area with fewer job opportunities. It further argues that the review panel erred in affirming the trial judge's finding in a subsequent proceeding that Money was an odd-lot worker in both the Lincoln and the Table Rock labor markets. It argues that Money failed to present any evidence of her ability to obtain employment in the Lincoln labor market.

II. BACKGROUND

1. MONEY'S INJURIES AND PAIN AFTER SURGERY
Tyrrell Flowers employed Money to work in the greenhouse and make deliveries for $8 an hour. In May 2000, she tripped on a small ledge and fell. She suffered injuries to her left chest wall, left shoulder, and neck. After the accident, Money developed headaches and primarily left-sided neck, shoulder, and arm pain. Testing later showed she had a herniated disk in her neck at the C5-6 level. In June 2001, after conservative treatment failed, a neurosurgeon recommended spinal surgery. He explained, however, that surgery could produce less than complete relief and that spinal fusion was "not so great for primary neck pain." Her surgery was postponed while Money attempted to quit smoking.
Sometime later in 2001, Money and her husband moved from Lincoln to Table Rock to live in a friend's house while the *56 friend was absent. For the use of the house, they were obligated to take care of the property and pay the taxes and utilities. Table Rock is about 75 miles southeast of Lincoln. Money was living in Table Rock in April 2002, when she underwent surgery for a cervical diskectomy and fusion at the C5-6 level.
After the surgery, Money initially improved, but her headaches and her neck and shoulder pain returned. After more testing, the neurosurgeon concluded that she did not need further surgery and referred her to a pain clinic. The record shows she had trigger-point injections and epidural steroid injections, which provided some relief.
When Money reached her maximum medical improvement in January 2003, Dr. David S. Diamant evaluated her permanent functional impairment. Because Money continued to have significant complaints of pain and functional impairment despite conservative treatments and surgical intervention, Diamant concluded she had a 28-percent whole-body impairment rating. A physical therapist determined Money could perform work with a light-medium physical demand classification. But he concluded that the test was invalid because he believed that Money's efforts had failed several validity factors. Money, however, testified that she was unable to complete the physical tests in 1 day because of pain. After reviewing these test results, Diamant concluded that Money could at least work at the light-duty physical demand level.
In June 2003, a vocational rehabilitation counselor, Patricia G. Conway, prepared a loss of earning capacity analysis. Conway concluded that Money could not perform her preinjury jobs of nursing assistant or plant-care worker. She concluded, however, that Money qualified for unskilled and low-level skilled work activity and could return to full-time employment earning wages between $6.50 and $8.50 per hour. She determined that Money had a 25-percent loss of earning capacity under the light-medium physical demand restriction and a 32-percent loss of earning capacity under the light physical demand restriction.
Conway also prepared Money's vocational rehabilitation plan. For a time, Money lived in Missouri with a friend after her husband was incarcerated and the owner of the rent-free house died. But she returned to the area and lived with another friend to participate in her rehabilitation plan. The plan consisted solely of job placement activities within 15 to 40 miles of Money's residence. The plan's goal was employment paying $7.50 to $8.50 per hour. The plan began on August 21, 2003, and ended on November 17.
Conway provided Money with a resume, cover letters, and job leads. Conway stated in a report that the geographic area had a reasonable offering of low-skilled to semiskilled positions that fit Money's physical restrictions. Money's job search got off to a slow start after she strained her neck while trying to avoid a vehicular accident. Afterward, she reported to Conway that it caused her considerable pain to drive any distance. But by October 2003, Conway reported that Money had been diligent and aggressive about participating in her job search. In 2004, Money returned to Table Rock to live with her husband in a house his parents purchased for them; his parents also helped with utilities.
Money continued to have pain. Yet, another physician did not find any abnormalities in her neck that surgical intervention could help. He concluded that Money's residual pain originated in her soft tissues: muscles, tendons, and ligaments. In July 2004, a sewing factory hired Money to sew lawnmower bags, but it soon *57 terminated her employment for absences related to her neck pain.
In March 2005, after reevaluating her, Diamant wrote that it was difficult to say whether Money could do light-duty work. Money still complained of constant low-level, and at times severe, pain and headaches. She had also reported intolerance to sitting more than 90 minutes. Yet, Diamant believed she could at least work in a sedentary-light physical demand capacity if she were to pursue such employment. The same month, her regular physician reported treating Money every 2 to 3 months during the preceding year for myofascial syndrome, or pain originating in the muscles. He stated that Money would likely need to rely on trigger-point injections in the future.
At trial in April 2005, Money testified that since her maximum medical improvement date, she had continued to have muscle spasms in her neck and shoulders, causing her pain and headaches. She stated that doing simple chores around the house could cause her pain but that if her activities were very limited, she might have only 4 to 5 bad days in a 2-month period. At times, she experiences blurred vision, nausea, trouble walking, and elevated blood pressure.

2. TRIAL JUDGE'S FINDINGS IN FIRST ORDER
In its order, the trial judge stated that it was Tyrrell's position the Money should be required to move back to Lincoln because she would have greater job opportunities. The judge found, however, that Money had not moved to Table Rock in bad faith or to reduce her employment opportunities. He concluded that her move for low-cost housing was, and continued to be, motivated by economic necessity. The judge further found that requiring Money to drive to Lincoln for a job that paid $6 to $8 per hour was not economically feasible. Accordingly, he concluded that the relevant labor market was in and around Table Rock.
Regarding Money's impairment, the trial judge found that the evidence showed Money had made a reasonable and good faith effort to find employment but had failed. He concluded that this evidence rebutted Conway's opinion regarding Money's loss of earning capacity. He further concluded that Money was "totally disabled and entitled to permanent total loss of earning power" because employers would not hire her.

3. REVIEW PANEL REVERSES AND REMANDS FOR CONSIDERATION OF BOTH LABOR MARKETS
Tyrrell appealed. The three-judge review panel agreed with Tyrrell that the trial judge erred in limiting Money's labor market to Table Rock even if she moved there in good faith. It reasoned that limiting the labor market to a claimant's new community would open the door to unscrupulous behavior. It remanded with instructions for the trial judge to reassess Money's permanent loss of earning power. It stated the trial judge should consider any evidence regarding plaintiff's labor market both where she was injured and the locale to which she relocated afterward.
On remand, the trial judge stated that its "reassessment of [Money's] loss of earning power includes the labor market in and around Table Rock, Nebraska, and the labor market at the time of her injury." He again found Money totally disabled under the odd-lot doctrine in both labor markets. He found that Money had a formal education through the eighth grade and had lost factory jobs because she was not "quick enough." He noted that she had lost a waitress job because she could not remember lists or operate a cash register without mistakes. He further noted *58 that she could not keep a checking account because the math was too difficult for her. The judge explicitly stated that because of her significant physical impairments, coupled with her intellectual deficiencies, she would be hired only by very sympathetic employers. Tyrrell again appealed.

4. REVIEW PANEL AFFIRMS IN TYRRELL'S SECOND APPEAL
In Tyrrell's second appeal, the review panel rejected Tyrrell's argument that the record lacked evidence of Money's loss of earning capacity in the Lincoln labor market. It focused on Money's testimony about her prior employment in Lincoln and her inability to perform those jobs after her injury. It further concluded the trial judge was not clearly wrong in determining Money had physical and cognitive impairments that prevented her from returning to gainful employment except with a sympathetic employer.

III. ASSIGNMENTS OF ERROR
Tyrrell assigns 14 errors, which are restated and condensed. Tyrrell assigns that the trial judge erred in finding that Money is entitled to permanent and total loss of earning power as an odd-lot worker who would only be hired by very sympathetic employers. It assigns that the review panel erred in affirming this finding. It also assigns that the trial judge erred in failing to require her to undergo additional vocational rehabilitation before finding her to be permanently and totally disabled.
Regarding the relevant labor market, Tyrrell assigns that the trial judge erred in (1) failing to include Lincoln in the relevant labor market when assessing Money's loss of earning power, (2) concluding that Money had proved her loss of earning power when she did not present evidence of the Lincoln labor market and the record lacked such evidence, (3) ignoring the law of the case by finding that Money was an odd-lot worker in its second order when it did not make this explicit finding in its first order, (4) finding that Money was an odd-lot worker in its second order when this finding was inconsistent with other findings in the first order, and (5) failing to provide a reasoned decision under Workers' Comp. Ct. R. of Proc. 11 (2006). Finally, Tyrrell assigns that the review panel erred in ignoring the trial judge's errors in its second order.

IV. STANDARD OF REVIEW
Under Neb.Rev.Stat. § 48-185 (Reissue 2004), we may modify, reverse, or set aside a Workers' Compensation Court decision only when (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award.[1]
[1, 2] On appellate review, the factual findings made by the trial judge of the Workers' Compensation Court have the effect of a jury verdict and will not be disturbed unless clearly wrong.[2] In workers' compensation cases, we are obligated to make our own determinations regarding questions of law.[3]

V. ANALYSIS

1. CORRECT LABOR MARKET
[3, 4] Tyrrell contends that the review panel erred in affirming the trial judge's *59 finding that Money was an odd-lot worker in both the Lincoln and the Table Rock labor markets. It argues that Money failed to prove loss of earning power, also referred to as earning capacity,[4] because she failed to present any evidence of her ability to procure employment in the Lincoln labor market. What a court may consider in assessing disability involves statutory construction and thus is a question of law.[5]
[5-7] A trial judge should base the compensation an employer pays on the worker's loss of earning power.[6] One of the factors used to assess earning power is the worker's general ability to procure employment.[7] In our recent decision in Giboo v. Certified Transmission Rebuilders,[8] we stated that this factor depends partly upon the number and type of jobs available in a given market. So the factor could change if the worker moves from a metropolitan labor market to a rural community with fewer available jobs.[9] Also, we concluded that a labor market encompasses employment opportunities within a reasonable geographic radius around a "hub" community. Thus, in Giboo, we concluded that the first step in identifying the relevant labor market for assessing a worker's loss of earning power is to determine whether the hub is where the injury occurred, or where the claimant resided when the injury occurred, or where the claimant resided at the time of the hearing.[10]
Like Tyrrell, the employer in Giboo argued that the labor market must include both the community where the injury occurred and the community to which the claimant moved. It argued that unless the labor market includes both communities, claimants could manipulate their earning power loss by moving to an area with fewer available jobs. We rejected that argument. We reasoned that requiring claimants to show that they had moved for legitimate reasons would screen out such claimants.
[8] We also recognized in Giboo that some courts additionally require claimants to show that they relocated because of economic necessity. But we declined to impose this burden. We believed it could potentially force claimants to choose between their statutory right to receive compensation and a legitimate desire to move for reasons that were not strictly economic. Thus, we held: If a claimant relocates to a new community in good faith, the new community will serve as the hub community from which to assess the claimant's loss of earning power.[11]
Our holding in Giboo conflicts with the review panel's determination that a court must assess loss of earning power based on both labor markets. We conclude that Money did not have to show her loss of earning power in both the Lincoln and the Table Rock communities.
*60 Tyrrell, however, contends that when the review panel issued its decision in Money's first appeal, neither this court nor the Court of Appeals, in a relocation case, had addressed the appropriate labor market. Because Money did not appeal that decision, Tyrrell argues the review panel's first decisionthat a trial judge must consider both labor marketsbecame the law of the case. It further argues that in the subsequent proceedings, neither the trial judge nor the review panel correctly assessed Money's loss of earning power based on both labor markets. We do not reach that issue because we conclude that the law-of-the-case doctrine does not apply in this circumstance.

2. LAW-OF-THE-CASE DOCTRINE
[9] Under the law-of-the-case doctrine, an appellate court's holdings on questions presented to it in reviewing the trial court's proceedings become the law of the case; those holdings conclusively settle, for that litigation, all matters ruled upon, either expressly or by necessary implication.[12]
[10-12] Unlike the doctrines of res judicata and collateral estoppel, which involve successive suits, the law-of-the-case doctrine involves successive stages of one continuing lawsuit.[13] The doctrine promotes judicial efficiency and protects parties' settled expectations by preventing parties from relitigating settled issues within a single action.[14] We have stated that "`[a]n issue which has been litigated and decided in one stage of a case should not be relitigated in a later stage.'"[15] At the appellate level, however, the law-of-the-case doctrine "`is not applied with the same rigor as res judicata or collateral estoppel.'"[16]
[13, 14] The doctrine applies with greater force when an appellate court remands a case to an inferior tribunal. In such a case, "`[t]he lower court is "without power" to take action inconsistent with the judgment of the appellate court.'"[17] But on appeal, the law-of-the-case doctrine is a rule of practice that operates to direct an appellate court's discretion, not to limit its power.[18]
[15] Generally, absent extraordinary circumstances, a court should be reluctant to revisit its own prior decision or that of another court in a single case.[19] So, in successive appeals of the same action, we have usually refused to reconsider substantially similar, if not identical, issues that we decided in a former appeal.[20] We *61 have also declined to reconsider issues decided in a former appeal to the Court of Appeals in the same action.[21] We recognize that the review panel of the Workers' Compensation Court sits as an appellate court when reviewing a trial judge's award.[22] But we conclude that this case presents an extraordinary circumstance  our intervening decision in Giboo.
[16-18] We have recognized two extraordinary circumstances when the doctrine will not apply. The doctrine does not apply "`if considerations of substantial justice suggest a reexamination of the issue is warranted.'"[23] Also, the doctrine does not apply in subsequent proceedings when the petitioner presents materially and substantially different facts.[24] We have not previously recognized a third extraordinary circumstance. Other courts, however, have held that the doctrine does not apply to an appellate court in a second appeal of the same action when "controlling authority has [issued] a contrary decision of the law applicable to such issues" from the time the first appellate decision was issued.[25] We agree that the most obvious justification for departing from the doctrine is an intervening change in the law.[26]
[19, 20] Accordingly, we now hold that the law-of-the-case doctrine does not apply in a later appeal of the same action if a higher court has since issued a contrary decision. The doctrine yields to this court's duty to oversee the development of consistent case law. This case presents such a circumstance. We conclude that our holding in Giboo is the controlling authority to determine the relevant labor market for assessing Money's loss of earning power. Thus, we disapprove the review panel's first decision.
Our disapproval of the first decision, however, does not affect the final judgment. Following remand, the trial judge found that Money was totally disabled in both the Lincoln and the Table Rock labor markets. This finding, however, resulted in the same award of benefits that Money would have received if the review panel had correctly affirmed the trial judge's first order. The rules set forth in Giboo are the rules that the trial judge applied in the first proceeding. He correctly determined that the area around Table Rock was the relevant labor market and that Lincoln should not be included in the labor market to assess Money's loss of earning power.

3. APPLICATION OF GIBOO SUPPORTS TRIAL JUDGE'S CONCLUSION THAT AREA AROUND TABLE ROCK IS THE RELEVANT LABOR MARKET

(a) Table Rock Is the Proper Hub Community
Under Giboo, the review panel incorrectly decided the relevant labor market. Thus, it did not address the trial judge's *62 factual finding that Money had moved to Table Rock in good faith. Nonetheless, the record supports the trial judge's finding that Money's move for low-cost housing was, and continued to be, motivated by economic necessity.
After her injury, Money and her husband moved to Table Rock to live rent free in a friend's house. She also testified that her husband had not worked since sometime in 2004 because of neck surgery. Finally, they currently live in Table Rock in a house purchased by her husband's parents. We conclude that the trial judge was not clearly wrong in finding that Money had a good faith, economic motive for her move to Table Rock. Accordingly, Table Rock served as Money's hub community.

(b) Trial Judge Properly Excluded Lincoln as an Additional Area to Include in the Relevant Labor Market
[21-23] In Giboo, we also held that after the trial judge determines the claimant's hub community, the trial judge may also consider whether surrounding communities are part of the relevant labor market. And whether a claimant should reasonably seek work in an area outside the hub community is a determination based on the totality of circumstances. We set out a nonexclusive list of factors that a trial judge should take into consideration: (1) availability of transportation, (2) duration of the commute, (3) length of workday the claimant is capable of working, (4) ability of the person to make the commute based on his or her physical condition, (5) economic feasibility of a person in the claimant's position working in that location, and (6) whether others who live in the claimant's hub community regularly seek employment in the prospective area.[27]
[24, 25] We further stated that court-appointed vocational rehabilitation experts should apply the same factors to guide them in selecting the relevant geographic areas. The opinions of a court-appointed vocational rehabilitation expert regarding vocational rehabilitation and loss of earning power have a rebuttable presumption of validity.[28] So, if an employer believes a vocational rehabilitation expert has incorrectly selected the relevant geographic areas, the employer has the burden to rebut the expert's opinion. The employer could then show there are employment opportunities reasonably available to the claimant in the prospective area.[29]
In a report to Tyrrell, Conway stated that a reasonable offering of jobs existed within a 15-to 40-mile range of Money's residence. None of Conway's job leads included Lincoln. Tyrrell did not contest Conway's rehabilitation plan or request that Conway include job leads for Lincoln. And the trial judge specifically rejected Lincoln as an area where Money should reasonably seek employment. The trial judge found that Money could not afford to commute 75 miles to Lincoln for a job that would pay $8 per hour when it considered the costs of fuel, insurance, and maintenance for a vehicle. The trial judge could have considered other factors  notably, whether Money physically could commute 150 miles daily.[30] On appeal, however, Tyrrell does not challenge the trial judge's cost analysis or argue that it was reasonable for Money to seek employment *63 in Lincoln. Its position is that commuting costs are irrelevant because the trial judge should have, as a matter of law, included Lincoln in the relevant labor market. We have rejected this argument. Tyrrell has not challenged Conway's geographic area or the trial judge's factual findings. Thus, we conclude that the trial judge was not clearly wrong in finding that it was unreasonable for Money to seek employment in Lincoln.

4. TRIAL JUDGE CORRECTLY CONCLUDED THAT MONEY WAS ENTITLED TO PERMANENT TOTAL DISABILITY AS AN ODD-LOT WORKER
[26, 27] Under the odd-lot doctrine,
"[t]otal disability may be found in the case of workers who, while not altogether incapacitated for work, are so handicapped that they will not be employed regularly in any well-known branch of the labor market. The essence of the test is the probable dependability with which claimant can sell his services in a competitive labor market, undistorted by such factors as business booms, sympathy of a particular employer or friends, temporary good luck, or the superhuman efforts of the claimant to rise above his crippling handicaps."[31]
In its first order, the trial judge found that Money had made reasonable and good faith efforts to find employment as part of her rehabilitation plan. Although Money had obtained her diploma through the GED program, the judge found she had cognitive limitations. He found that Money was permanently and totally disabled "because of her impairments and restrictions and because employers just aren't going to hire her." In its second order following remand, the trial judge explicitly found that Money "would only be hired by very sympathetic employers" because of her significant physical impairments, reading and math deficiencies, and intellectual limitations.
Tyrrell does not specifically argue that the trial judge erred in finding Money permanently and totally disabled in the Table Rock labor market. The thrust of its argument is that the relevant labor market should include Lincoln, an argument we have rejected. Tyrrell, however, does argue that the trial judge erred in failing to require Money to undergo additional vocational rehabilitation. It argues that Money should have continued to search for employment before the trial judge concluded that she was permanently and totally disabled. It contends the trial judge should have required this because all the medical experts believed Money had some capacity to return to work. We interpret Tyrrell's argument to be that Money is not totally and permanently disabled because medical experts believed she could perform some work functions. But we have previously rejected such contentions when reviewing findings of disability under the odd-lot doctrine.
[28, 29] To recover benefits, a claimant must prove by a preponderance of the evidence that an accident or occupational disease arose out of or occurred in the course of the employment.[32] The claimant must also show by a preponderance of the evidence that the accident or occupational disease proximately caused an injury *64 which resulted in compensable disability.[33] Finally, an injured worker must prove by competent medical testimony a causal connection between the alleged injury, the employment, and the disability.[34]
[30-32] In assessing a claimant's disability, physical restrictions and impairment ratings are important. Yet, once the claim-ant establishes the cause of disability, the trial judge is not limited to this evidence. The trial judge may also rely on the claimant's testimony to determine the extent of the disability.[35] Disability, in contrast to impairment, is an economic inquiry. It can be determined only within the context of the personal, social, or occupational demands or statutory or regulatory requirements that the individual is unable to meet because of the impairment.[36] And total disability does not mean a state of absolute helplessness. It means that because of an injury, (1) a worker cannot earn wages in the same kind of work, or work of a similar nature, that he or she was trained for or accustomed to perform or (2) the worker cannot earn wages for work for any other kind of work which a person of his or her mentality and attainments could do.[37]
[33-35] Whether a plaintiff is totally and permanently disabled is a question of fact.[38] When testing the trial judge's findings of fact, we consider the evidence in the light most favorable to the successful party. And we give the successful party the benefit of every inference reasonably deducible from the evidence.[39] As the trier of fact, the trial judge determines the credibility of the witnesses and the weight to give their testimony.[40]
The evidence shows that Money was 37 years old at the time of the accident. She completed the eighth grade and had limited cognitive abilities. In 1990, she received her diploma through the GED program and her nursing assistant certificate. Before her job with Tyrrell Flowers, her work history included experience as a nursing assistant, security guard, janitor, waitress, and factory worker. As noted, Conway concluded that she could no longer perform work functions related to plant care or nursing assistance. Money testified that she had not received any specialized education for her previous jobs and that she had lost some jobs because of her slowness or mistakes.
As the trial judge noted, Money was fired from a waitress job because she could not remember lists and made mistakes on the cash register. She could not type and had not operated a cash register at Tyrrell Flowers or at any other job besides her waitress job. She had also lost factory jobs because she was not quick enough. In August 2004, a psychologist evaluated Money's intelligence using a "WAIS-III" intelligence test. Money scored 89 on her full-scale intelligence test, which was deemed valid. The psychologist assessed Money's overall functioning at a low-average to average intelligence level but concluded she could follow simple instructions under ordinary supervision.
*65 Notably, Conway did not recommend retraining Money to perform sedentary or light-duty work as part of the vocational rehabilitation plan. And Tyrrell did not request job training. The rehabilitation plan was for job placement activities. From September to November 2003, Money reported making 68 employer contacts and submitting 27 resumes or applications. She testified that she applied for about 100 jobs between August 2003 and July 2004. During her job search, a prospective employer turned her down for a telephone sales position because of her poor reading skills. She also applied for sedentary positions as a dietary aide and grain elevator clerk, but she was not hired.
Money was able to convince only one employer to hire her for a low-skilled job at a sewing factory. She worked there full time for only 4 days before she had to leave to receive treatment for muscle spasms and severe headaches. After the first week, she attempted to continue working part time but lasted less than 2 weeks because of absences related to her neck problems.
Similarly, Money testified extensively about her limited ability to perform daily life activities and simple household tasks without pain. She also stated that she changed her activities at home frequently to avoid pain but that all her activities were at a physically low level. The evidence further shows that Money did not have transferable skills to obtain work within her physical abilities. The trial judge could properly rely on her testimony in determining that her physical abilities were limited after her injury. His findings of fact were not clearly wrong. As we have previously recognized:
"A considerable number of the odd-lot cases involve claimants whose adaptability to the new situation created by their physical injury was constricted by lack of mental capacity or education. This is a sensible result, since it is a matter of common observation that a man whose sole stock in trade has been the capacity to perform physical movements, and whose ability to make those movements has been impaired by injury, is under a severe disadvantage in acquiring a dependable new means of livelihood."[41]
In factually similar cases, we have affirmed the finding of total disability under the odd-lot doctrine.[42]
We conclude that Money's evidence of her significant physical impairments after the injury and her limited cognitive abilities was sufficient to support the trial judge's finding of permanent and total disability under the odd-lot doctrine.

VI. CONCLUSION
We conclude that the workers' compensation trial judge correctly determined that the relevant labor market for assessing Money's loss of earning power was the area in and around Table Rock. It also correctly determined that Lincoln was not a surrounding community that should be included in that labor market. Although we had not yet issued our decision in Giboo,[43] the trial judge correctly applied the rules we set forth in Giboo to make these determinations. We further conclude that the three-judge review panel, in Money's *66 first appeal, incorrectly determined that a claimant's loss of earning power must be based on both the community where the claimant was injured and the community to which she moved in good faith. Although Money did not appeal from the review panel's first decision, we conclude that this decision is not the law of the case because it is contrary to our subsequent decision in Giboo.
We therefore disapprove the review panel's first decision. This disapproval, however, does not affect Money's award of benefits. After the trial judge again determined in the subsequent proceeding that Money was entitled to benefits for total disability, the review panel affirmed the award on different grounds. Because we conclude that the trial judge was not clearly wrong in finding that Money was totally and permanently disabled in the Table Rock labor market under the odd-lot doctrine of disability, we affirm.
AFFIRMED.
NOTES
[1] Knapp v. Village of Beaver City, 273 Neb. 156, 728 N.W.2d 96 (2007).
[2] See Olivotto v. DeMarco Bros. Co., 273 Neb. 672, 732 N.W.2d 354 (2007).
[3] See Davis v. Crete Carrier Corp., 274 Neb. 362, 740 N.W.2d 598 (2007).
[4] See Giboo v. Certified Transmission Rebuilders, 275 Neb. 369, 746 N.W.2d 362 (2008); Olivotto, supra note 2.
[5] Harmon v. Irby Constr. Co., 258 Neb. 420, 604 N.W.2d 813 (1999).
[6] See, Neb.Rev.Stat. § 48-121 (Reissue 2004); Davis v. Goodyear Tire & Rubber Co., 269 Neb. 683, 696 N.W.2d 142 (2005).
[7] See Davis, supra note 6.
[8] Giboo, supra note 4.
[9] See id.
[10] See id., citing Kelly Services v. Industrial Comm'n, 210 Ariz. 16, 106 P.3d 1031 (Ariz. App.2005), and Davaz v. Priest River Glass Co., 125 Idaho 333, 870 P.2d 1292 (1994).
[11] See Giboo, supra note 4.
[12] See Thomas v. State, 268 Neb. 594, 685 N.W.2d 66 (2004).
[13] See In re Application of City of Lincoln, 243 Neb. 458, 500 N.W.2d 183 (1993).
[14] See, e.g., Maxfield v. Cintas Corp. No. 2, 487 F.3d 1132 (8th Cir.2007).
[15] In re Application of City of Lincoln, supra note 13, 243 Neb. at 467, 500 N.W.2d at 190, quoting Milton D. Green, Basic Civil Procedure (2d ed.1979). See, also, United States v. U.S. Smelting Co., 339 U.S. 186, 70 S.Ct. 537, 94 L.Ed. 750 (1950), citing Messenger v. Anderson, 225 U.S. 436, 32 S.Ct. 739, 56 L.Ed. 1152 (1912) (Holmes, J.).
[16] In re Application of City of Lincoln, supra note 13, 243 Neb. at 468, 500 N.W.2d at 190, quoting Green, supra note 15.
[17] State v. White, 257 Neb. 943, 947, 601 N.W.2d 731, 734 (1999), quoting People v. Russell, 149 Mich.App. 110, 385 N.W.2d 613 (1985).
[18] See, Arizona v. California, 460 U.S. 605, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983); Messenger, supra note 15.
[19] See Christianson v. Colt Industries Operating Corp., 486 U.S. 800, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988).
[20] See, e.g., Talle v. Nebraska Dept. of Soc. Servs., 253 Neb. 823, 572 N.W.2d 790 (1998).
[21] See, e.g., Houston v. Metrovision, Inc., 267 Neb. 730, 677 N.W.2d 139 (2004).
[22] Nunn v. Texaco Trading & Transp., 3 Neb. App. 101, 523 N.W.2d 705 (1994), citing Neb. Rev.Stat. § 48-179 (Reissue 1993).
[23] In re Application of City of Lincoln, supra note 13, 243 Neb. at 468, 500 N.W.2d at 190, quoting Green, supra note 15.
[24] See Latenser v. Intercessors of the Lamb, Inc., 250 Neb. 789, 553 N.W.2d 458 (1996). See, also, Schuelke v. Wilson, 255 Neb. 726, 587 N.W.2d 369 (1998); Bezdek v. Patrick, 170 Neb. 522, 103 N.W.2d 318 (1960).
[25] White v. Murtha, 377 F.2d 428, 432 (5th Cir.1967). Accord 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4478 (2d ed.2002).
[26] See 18B Wright et al., supra note 25.
[27] See Giboo, supra note 4.
[28] Neb.Rev.Stat. § 48-162.01 (Supp. 1999); Giboo, supra note 4.
[29] Giboo, supra note 4.
[30] See, e.g., Hurley v. Stuart Fine Foods, 687 So.2d 310 (Fla.App.1997); Fredenburg v. Control Data Corp., 311 N.W.2d 860 (Minn. 1981); Karpulk v. W.C.A.B. (Worth and Co.), 708 A.2d 513 (Pa.Cmwlth. 1998).
[31] Heiliger v. Walters & Heiliger Electric, Inc., 236 Neb. 459, 470-71, 461 N.W.2d 565, 574 (1990) (quoting treatise passage currently found at 4 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 83.02 (2007)). See, also, Schlup v. Auburn Needleworks, 239 Neb. 854, 479 N.W.2d 440 (1992).
[32] See Olivotto, supra note 2. See, also, Neb. Rev.Stat. § 48-151(2) (Supp.1999).
[33] See id.
[34] See Owen v. American Hydraulics, 254 Neb. 685, 578 N.W.2d 57 (1998).
[35] See, Frauendorfer v. Lindsay Mfg. Co., 263 Neb. 237, 639 N.W.2d 125 (2002); Luehring v. Tibbs Constr. Co., 235 Neb. 883, 457 N.W.2d 815 (1990).
[36] See Frauendorfer, supra note 34.
[37] See id.
[38] See id.; Schlup, supra note 31.
[39] See Olivotto, supra note 2.
[40] See Vega v. Iowa Beef Processors, 270 Neb. 255, 699 N.W.2d 407 (2005).
[41] Mata v. Western Valley Packing, 236 Neb. 584, 589, 462 N.W.2d 869, 873 (1990) (quoting treatise passage currently found at 4 Larson & Larson, supra note 31, § 83.04).
[42] See, Frauendorfer, supra note 35; Schlup, supra note 31. See, also, Luehring, supra note 35; Heironymus v. Jacobsen Transfer, 215 Neb. 209, 337 N.W.2d 769 (1983).
[43] Giboo, supra note 4.