IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

TOMPKIN V. RTG MEDICAL

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JANET TOMPKIN, APPELLEE,

V.

RTG MEDICAL, APPELLANT.

Filed October 18, 2016.    No. A-16-045.

Appeal from the Workers' Compensation Court: JOHN R. HOFFERT, Judge. Affirmed.

Christopher A. Sievers, of Prentiss Grant, L.L.C., for appellant.

Michaela Skogerboe and James E. Harris, of Harris & Associates, P.C., L.L.O., for appellee.

MOORE, Chief Judge, and RIEDMANN and PIRTLE, Judges.

MOORE, Chief Judge.

## I. INTRODUCTION

RTG Medical appeals from orders of the Nebraska Workers' Compensation Court awarding Janet Tompkins ongoing temporary total disability benefits and medical expenses to include treatment of complex regional pain syndrome and depression, along with penalties, attorney fees, and interest. On appeal, RTG Medical challenges the finding of a causal connection between Janet's accident and claimed injuries; ordering of ongoing disability benefits despite alleged employability; and awarding of penalties, interest, and attorney fees. Because we find no error, we affirm.

- 1 -

## II. BACKGROUND

### 1. Janet's Employment, Original Injury, and Medical Treatment Prior to Court's Initial Award

On January 21, 2012, while Janet was employed by RTG Medical as a traveling nurse at a medical facility in Brookings, South Dakota, she slipped and fell on ice while walking outside the motel where she was being lodged. She landed on her outstretched left hand and wrist, her nondominant side, fracturing the left forearm. Janet did not hit her head or lose consciousness as a result of the fall. She denied having injuries beyond left forearm pain at that time.

Janet was taken to a nearby emergency room that same day, where x rays revealed a left distal radius fracture. Closed reduction surgery was performed on the fracture, and the left arm was secured by a splint. Medical records note that Janet was taking depression medication at this time.

Janet attempted a return to work the following workday, but was told by physicians at the medical facility after examination that she would be unable to work for approximately 12 weeks. They instructed her to go home. On that same day, Janet informed RTG Medical of her accident and injuries. Because Janet could not drive, her daughter transported Janet from Brookings to the daughter's home in Wisconsin.

Upon arriving in Wisconsin in January 2012, Janet was referred to Dr. Patrick Hall, an orthopedic surgeon. Hall examined Janet and performed an open reduction internal fixation of the left distal radius fracture. He expressed the opinion that Janet's left arm/wrist injury was causally related to the accident. Hall referred Janet to an occupational therapist.

In March 2012, Janet began attending occupational therapy. During these appointments, it was noted that Janet suffered from severe pain and substantial stiffness limiting her range of motion, all pertaining to the left forearm, wrist, and hand. The occupational therapist reported to Hall, expressing that the amount of pain experienced by Janet was reflective of complex regional pain syndrome.

Janet ended this initial round of occupational therapy in May 2012 upon return to her Florida home. The occupational therapy discharge summary, signed by Hall, noted that Janet suffered from "pain well beyond proportion of injury." X rays indicated that the facture was healing and bones were in alignment. It was observed that Janet received some relief through treatment, but not significant enough to really improve function. Hall "had questions" regarding whether Janet suffered from complex regional pain syndrome due to the severe pain and presence of swelling and discoloration. It was recommended that Janet continue seeing an orthopedic doctor and participate in further occupational therapy upon returning to Florida.

Similar observations and diagnoses were made during Janet's occupational therapy in Florida from June through August 2012. Janet continued to be limited to light activity due to severe pain in the left hand, forearm, and wrist. Her wrist remained very stiff and sensitive to the touch. Janet was unable to grasp or lift objects with her left hand and experienced shooting pain from the hand up into the forearm.

During August 2012, Janet twice attempted to reenter the workforce. The first position was a one-day temporary job administering flu shots. The second position was at a school for severely

handicapped children. The record does not indicate how long this employment lasted. Janet testified that these positions required significant accommodations to account for her inability to use her left hand, and she felt unable to fulfill the assigned job duties. Regarding the second position, she noted her co-workers were not happy "because they were doing the work and I was getting paid." Janet indicated during physical therapy that working made the pain worse. She voluntarily left both these positions.

Janet met with Dr. Siddharth Shah, a neurologist, from August through November 2012. Once again, Janet complained of severe pain in the left forearm, along with experiencing an electric shock sensation. The muscles of her left hand were weak, with grip and sensation being diminished. Her left hand suffered significant stiffness, being unable to bend, squeeze, or extend this hand, or touch the left thumb and outer area of the left forearm. Janet denied any neck or radicular pains. Shah also conducted a neurological evaluation, including EMG and nerve conduction studies. The EMG showed possible C7-T1 radiculopathy and the nerve conduction studies were normal. Shah wrote a letter stating that Janet suffers from severe left hand pain and could not bear any weight. Shah recommended pain medications and continued therapy. Shah also referred Janet to a pain management doctor. However, Janet testified that she was unable to begin treatment with a pain management physician at that time because it was not authorized by RTG Medical.

Shah formed the opinion, contained within a September 2012 medical report, that "with reasonable medical certainty and probability, (Janet's) injuries, diagnoses, complaints, and treatment are casually (sic) connected to the slip and fall accident." Shah initially made inconsistent reports regarding whether Janet had reached maximum medical improvement and suffered from complex regional pain syndrome. However, he later clarified that Janet had reached maximum medical improvement from a neurological standpoint, and she most likely has complex regional pain syndrome.

Dr. Nicholas Strobbe, Janet's primary care physician, examined her on October 11, 2012. His assessment noted "reflex sympathetic dystrophy", which is another term for complex regional pain syndrome. Strobbe provided Janet with a return-to-work note on this date establishing a 2-pound lifting restriction for the left hand.

### 2. ORIGINAL WORKERS' COMPENSATION COURT ORDER

On November 13, 2012, following the parties' stipulation of dismissal, the Nebraska Workers' Compensation Court entered an order finding that Janet sustained personal injuries in an accident on January 21, 2012 arising out of and in the course of employment with RTG Medical. As a result, the court determined that Janet was entitled to workers' compensation benefits. The court found Janet had not yet reached maximum medical improvement and was entitled to temporary total and/or temporary partial disability benefits beginning October 13, 2012 and continuing for so long as she is temporarily disabled. Further, the court found that pursuant to Neb. Rev. Stat. § 48-120 (Reissue 2010), Janet is entitled to future medical care from October 2, 2012 going forward that is reasonable and necessary to treat her compensable injuries resulting from the accident.

### 3. RTG MEDICAL'S PETITION TO MODIFY
### AND JANET'S ANSWER

On December 13, 2013, RTG Medical filed a petition to modify the court's prior order granting Janet workers' compensation benefits. RTG Medical alleged that Janet had sustained a material and substantial change in condition since entry of the original order, warranting a change or reduction in benefits owed by RTG Medical.

On January 15, 2014, Janet filed an answer denying RTG Medical's assertion. To the contrary, Janet alleged she experienced an increase in incapacity since entry of the original order, including damage to her left arm, complex regional pain syndrome, and impairment to the cervical spine. Further, Janet alleged that her work-related injuries have combined with, aggravated, or exacerbated her preexisting depression. Janet claimed to have not yet reached maximum medical improvement for the injuries resulting from her fall, and she remains temporarily totally disabled. She additionally asserted that RTG Medical failed to pay the proper amount of past benefits in a timely manner. Janet requested compensation and reimbursement for medical expenses, medical-related mileage, waiting-time penalties, attorney fees, and interest.

### 4. TREATMENT OF PHYSICAL INJURIES/COMPLEX REGIONAL
### PAIN SYNDROME FOLLOWING ORIGINAL AWARD

One year following the accident, Janet testified to being in considerable pain. Her left hand strength and range of motion remained minimal, and she was unable to lift objects or open doors with this hand.

In January 2013, RTG Medical requested an independent medical examination of Janet by Dr. Thomas Greene. Greene responded to a questionnaire provided by RTG Medical, wherein he opined that Janet was not at maximum medical improvement of the left arm, and he recommended removing the internal fixation along with hand therapy.

Upon referral by Strobbe, Janet began treatment with Dr. Edwin Colon, a pain management physician, in October 2013. Because this treatment was not authorized by RTG Medical, the cost was billed to Medicare and TriCare. Janet completed a form during her first appointment, explaining that the pain has negatively impacted her personality and life style, causing depression and considerable stress. Colon noted that Janet suffered from persistent pain and limited range of motion despite extensive treatment. Janet expressed to Colon that her pain and symptoms have gotten worse.

Colon diagnosed Janet with complex regional pain syndrome of the upper limb. Colon noted that Janet experienced swelling of the left wrist, severe tenderness, electrical bolt pain, and atrophic changes of the thumb. Janet's needs were noted to be beyond manageable by traditional means of pain medication and physical therapy. Because the symptoms and pain had worsened, Colon referred Janet back to Shah to repeat various testing.

Janet returned to Shah in October 2013, who noted that Janet suffered from severe left arm complex regional pain syndrome, which was ongoing and worsening since the wrist surgeries. An MRI of Janet's cervical spine was also conducted during this time, which revealed several conditions. Shah instructed Janet to follow up with Colon regarding pain management.

Following receipt of test results, Colon administered cervical epidural injections in early 2014. These injections provided some relief, but the symptoms persisted and pain returned to the left upper extremity at high levels. Colon noted that Janet's symptoms began to be more consistent with complex regional pain syndrome at this time. Colon subsequently administered nerve blocks to the front of the neck, which improved Janet's upper extremity pain. Janet subsequently was able to reduce the amount of pain medication.

Janet returned to Greene during this period, who recommended the removal of hardware contained within her wrist followed by therapy. Colon and Shah agreed with Greene that the internal fixation should be surgically removed.

Shah opined at this time that Janet's cervical issues were not connected to the accident. Colon later reached the same conclusion. However, Shah stated that Janet required continuing medical treatment for injuries resulting from the fall, including pain medications and physical therapy for her hand indefinitely into the future. On January 30, 2014, Shah formed the opinion that Janet was not at maximum medical improvement, and had permanent restrictions and limitations from the injury.

In May 2014, Janet returned to Colon complaining of pain in the left wrist radiating to surrounding areas. Colon found her to be totally disabled at that time. Colon subsequently responded to a medical questionnaire, opining that Janet suffered from complex regional pain syndrome causally connected to the accident and resulting surgical intervention.

Also in May 2014, Greene surgically removed the internal fixation hardware from Janet's left wrist. However, Janet testified that this procedure caused the pain to increase, with electrical bolt sensations now shooting further up her arm.

Janet followed up with Colon in June 2014 after the removal surgery, complaining of more pain and sensitivity at the surgical site. Examination of the left wrist and hand demonstrated numerous conditions, including weak range of motion, pain in movement, tenderness, poor grip strength, and significant sensitivity. Janet reported severe pain which negatively affected her sleep, personality, and stress levels, along with causing depression. Colon's diagnosis continued to include complex regional pain syndrome of the upper limb.

Janet returned to Greene in July 2014. Similar symptoms were reported by Janet and observed during examination. Greene later noted that Janet's functional limitations and restrictions for use of the left hand were substantial, being capable of probably no more than sedentary use. Greene indicated that maximum medical improvement had not been achieved and Janet was not to use her left hand.

In August 2014, Colon noted that Janet's medications were not working as well, and any benefit achieved from nerve blocks was gone. Colon's diagnosis continued to include complex regional pain syndrome of the upper limb. A couple weeks later, Janet followed up with Shah. Similar observations and findings were made, more tests were conducted, and a referral was made to Dr. Soliman, a neurosurgeon.

In January 2015, Greene provided brief responses to a questionnaire from RTG Medical's attorneys. Greene opined that Janet's left distal radius fracture had been resolved. Greene was asked to confirm whether Janet currently has complex regional pain syndrome resulting from the accident, and to explain his opinion in detail. Greene responded as follows: "Does not. No clinical

evidence. Pain subjective and [l]oss of hand motion not physiologic." Greene stated that Janet had reached maximum medical improvement, had "no restrictions," and required no further medical treatment for injuries sustained in the accident. Also in January 2015, Shah provided a report addressing the results of a recent bone scan of the hand and wrist. Shah expressed that the scan results "do not support a neurovascular effect such as (complex regional pain syndrome)."

In March 2015, Janet was evaluated by Soliman. After examining recent tests, Soliman noted that the symptoms did not appear to be related to the cervical spine, but rather associated with chronic wrist pain secondary to the severe fracture and resulting repair. Janet also filled out a patient evaluation form, expressing signs of physical pain and depression similar to prior reports.

Janet was subsequently referred to Dr. Hashim, who inserted a spinal cord stimulator into Janet's back for a trial period of three days in April 2015. Janet reported that the stimulator provided improvement and relief of pain. Hashim's diagnosis included severe left complex regional pain syndrome of the upper limb. He recommended permanent placement of the stimulator.

Janet followed up with Colon, Shah, and Soliman in the months leading up to trial. Colon continued to diagnose Janet with complex regional pain syndrome and continued to prescribe pain medications. Shah and Soliman similarly maintained a diagnosis of complex regional pain syndrome.

Soliman explained that this syndrome is a "symptom complex and in the absence of an agreed gold standard multiple tests are necessary to verify the authenticity of this diagnosis." Dr. Soliman opined that the injuries suffered in the work accident are causally connected to Janet's current problems. Soliman further determined that Janet was not at maximum medical improvement for her work-related physical injuries. He recommended the spinal cord stimulator for treatment, as it has benefited many patients with the same condition.

### 5. DIAGNOSIS AND TREATMENT OF DEPRESSION
### SUBSEQUENT TO ORIGINAL AWARD

One year following the accident, Janet claimed to be suffering from depression and panic attacks as a result of being told she could never work as a nurse again, which she described as her "whole life." As noted above, Janet reported depression to her physicians as she was treating for her physical injuries.

Strobbe referred Janet for a psychiatric consultation on February 6, 2013. On May 6, 2013 Strobbe responded to a medical questionnaire, opining that Janet's current psychological condition was causally related to the accident and/or the accident caused aggravation of a preexisting psychological condition. Strobbe stated it was reasonable and necessary for Janet to be evaluated and treated by a psychiatrist. However, Janet was unable to see a psychiatrist at that time due to lack of authorization by RTG Medical.

In an effort to have the psychiatric and pain management treatment authorized, Janet's attorney sent RTG Medical's attorney a letter in May 2013, which included Strobbe's questionnaire responses regarding Janet's psychological condition and the referral to Colon, a pain management physician. A follow-up letter was sent two months later, but approval was never

granted by RTG Medical for either treatment. On a similar note, as addressed below, RTG Medical made late disability benefits payments on three occasions.

Janet began psychiatric treatment with Dr. Raghu Devabhaktuni in August 2013, which treatment was billed to Medicare and TriCare since RTG Medical did not authorize this treatment. Devabhaktuni noted in part the following conditions, observed during appointments and reported by Janet: depression, anxiety, panic attacks, frequent mood swings, manic episodes, trouble concentrating, poor sleep, impulsivity, impatience, irritability, anxiety, low self-esteem, and hopelessness.

The death of Janet's husband in 2004 and daughter in 2010 were topics of discussion during this treatment. Devabhaktuni noted that Janet complained of being under increased stress, and he also noted she had problems dealing with the losses of her husband and daughter. Janet testified to having depression and panic attacks after her husband's death for a period of six months to a year. She "went back to work and tried to stay busy" during this period, and felt these psychological issues were resolved after his death. Similarly, Janet attested to having depression and panic attacks after her daughter's death. Once again, she "went back to work right after," noting that she worked a lot, which was therapeutic and helped her deal with these psychological issues. Janet claims to have never seen a psychiatrist or participated in individual counseling prior to the accident.

Devabhaktuni's diagnosis for Janet was "Major Depression Recurrent, Severe, Panic Disorder" and that her Axis IV was "severe." As a result, Devabhaktuni recommended treatment in the form of supportive psychotherapy, stress management, and antidepressant medications. He also referred Janet to individual counseling. However, Janet was unable to participate in this counseling because the provider does not accept Medicare and it was not authorized by RTG Medical. Responding to a medical questionnaire, dated August 28, 2014, Devabhaktuni agreed that Janet's mental health condition is causally related to the accident, and she has yet to reach maximum medical improvement for these mental health injuries.

In February 2015, Dr. Michael Maher performed an independent psychiatric evaluation of Janet at the request of RTG Medical. Maher interviewed Janet and reviewed her medical records. First, Maher determined that Janet had "reached maximum medical improvement with regard to her psychological and psychiatric condition," while noting that this conclusion "should not be interpreted as precluding the possibility that further treatment might result in a higher level of well-being." Maher also opined that Janet had "no psychiatric restrictions with regard to her work." Second, Maher noted that Janet's physical and psychological condition are "deeply and fundamentally related," and an improvement in her physical condition and reduction in pain will improve mental health substantially. Third, Maher found Janet's depression to be related to three primary areas: physical injuries and associated disability, and resulting impact on work-life and self-esteem; chronic pain; and life experience and loneliness since the death of her husband. Maher identified the first area as being the most significant of the three. Lastly, Maher noted that "thorough and continuing vocational rehabilitation efforts" would likely benefit Janet.

On July 20, 2015, trial was held on the petition to modify and Janet's answer asserting an increase in incapacity. The evidence concerning Janet's medical history and treatment following the initial order in November 2012 is set forth above.

On September 1, 2015, the court entered a Further Award. First, the court determined that Janet "carried her burden of proof and persuasion establishing that [she] suffers from complex regional pain syndrome as a result of the injury sustained to her left hand/arm." The court reached this conclusion on the basis that the evidence presented by Janet, specifically the records of Soliman and Colon, was "simply more persuasive" than that offered by RTG Medical. The court additionally found that Janet is in need of further medical treatment, specifically spinal cord stimulation and pain management, as prescribed by Soliman. Therefore, the court determined that Janet had not yet reached maximum medical improvement for her physical injury.

The court also found that Janet "suffered a mental injury and has yet to reach her true maximum medical healing from her psychiatric injury." The court based this finding on the opinions offered by Devabhaktuni and Maher, along with "the specter of ongoing medication and recommended therapy" present in this case.

Because Janet had not yet reached maximum medical improvement for all injuries sustained, including complex regional pain syndrome and an aggravation of preexisting depression, the court ordered the payment of ongoing temporary total disability benefits. Citing to the original order, establishing that RTG Medical was to pay for reasonable and necessary future medical care to treat all of Janet's compensable injuries, the court further held that such treatment was to include not only the left upper extremity injury but also the resulting complex regional pain syndrome and psychological injury.

The court rejected Janet's claim of a cervical injury resulting from the accident. Janet does not challenge this finding on appeal, and we need not discuss it further.

On December 10, 2015, a subsequent hearing was held before the court addressing Janet's request for the imposition of penalties, interest, and attorney fees upon RTG Medical for late and denied payments. Exhibits were received in evidence, including affidavits by Janet and her attorney, along with attached medical records, a summary of paid benefits, and various attorney communications. Within these communications were attempts by Janet's attorney to facilitate the late payment of medical expenses by RTG Medical and to gain authorization from RTG Medical for pain management and mental health treatment.

On December 31, 2015, the court entered an order sustaining Janet's request for an award of penalties, interest, and attorney fees. First, the court found that RTG Medical did not timely pay various weekly temporary total disability benefits; specifically, that RTG Medical made payments 5 days late on two occurrences and 15 days late on another occasion. The court therefore ordered a waiting-time penalty of $1,160.25.

Second, the court, having determined in its September order that Janet sustained the burden of linking depression to the accident and injuries sustained, found that RTG Medical wrongly refused to pay for mental health treatment. The court found this denial of payment to be baseless

up until Maher's February 2015 report declaring Janet to be at maximum medical improvement for her mental injury. The court determined an award of $1,000 in attorney fees to be appropriate. The court chose to focus on the failure to authorize mental health treatment rather than pain management treatment in awarding attorney fees. Lastly, the award of penalties and attorney fees triggered an award of interest amounting to $8.02.

RTG Medical subsequently perfected this appeal.

### III. ASSIGNMENTS OF ERROR

RTG Medical assigns, summarized, restated, combined, and reordered, that the workers' compensation court erred in (1) finding Janet sustained complex regional pain syndrome resulting from the fall, (2) finding Janet's ongoing depression is causally related to the fall, (3) ordering ongoing disability benefits despite proof of employability, (4) awarding penalties and interest for late payment of temporary total disability benefits; and (5) awarding attorney fees for delayed authorization of depression treatment.

### IV. STANDARD OF REVIEW

A judgment, order, or award of the Workers' Compensation Court may be modified, reversed, or set aside only upon the grounds that (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Hynes v. Good Samaritan Hosp.*, 285 Neb. 985, 830 N.W.2d 499 (2013).

On appellate review, the factual findings made by the trial judge of the Workers' Compensation Court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Armstrong v. State*, 290 Neb. 205, 859 N.W.2d 541 (2015). Neb. Rev. Stat. § 48-185 (Reissue 2010) precludes an appellate court's substitution of its view of the facts for that of the Workers' Compensation Court if the record contains sufficient evidence to substantiate the factual conclusions reached by the compensation court. *Davis v. Goodyear Tire & Rubber Co.*, 269 Neb. 683, 696 N.W.2d 142 (2005). In workers' compensation cases, an appellate court determines questions of law. *Armstrong, supra.*

As the trier of fact, the Workers' Compensation Court is the sole judge of the credibility of witnesses and the weight to be given their testimony. *Manchester v. Drivers Mgmt.*, 278 Neb. 776, 775 N.W.2d 179 (2009).

When testing the sufficiency of the evidence to support findings of fact made by the Workers' Compensation Court trial judge, the evidence must be considered in the light most favorable to the successful party and the successful party will have the benefit of every inference reasonably deducible from the evidence. *Olivotto v. DeMarco Bros. Co.*, 273 Neb. 672, 732 N.W.2d 354 (2007).

V. ANALYSIS

1. CAUSAL RELATIONSHIP BETWEEN INJURIES AND ACCIDENT

In order to recover under the Nebraska Workers' Compensation Act, a claimant has the burden of proving by a preponderance of the evidence that an accident or occupational disease arising out of and occurring in the course of employment proximately caused an injury which resulted in disability compensable under the act. *Manchester v. Drivers Mgmt.*, 278 Neb. 776, 775 N.W.2d 179 (2009). A workers' compensation award cannot be based on possibility or speculation, and if an inference favorable to the claimant can be reached only on the basis thereof, then the claimant cannot recover. *Visoso v. Cargill Meat Solutions*, 285 Neb. 272, 826 N.W.2d 845 (2013).

The causal connection between alleged injury, employment, and disability must be proven by competent medical testimony. See *Money v. Tyrrell Flowers*, 275 Neb. 602, 748 N.W.2d 49 (2008). A proximate cause is a cause that produces a result in a natural and continuous sequence and without which the result would not have occurred. *Manchester, supra.* The determination of causation is ordinarily a matter for the trier of fact. *Hynes v. Good Samaritan Hosp.*, 291 Neb. 757, 869 N.W.2d 78 (2015).

(a) Complex Regional Pain Syndrome

RTG Medical argues that the medical evidence contained in the record does not support a finding that Janet suffers from complex regional pain syndrome as a result of her fall.

Upon our review of the record, considering the evidence in a light most favorable to Janet, we find the court did not err in concluding Janet suffered from complex regional pain syndrome (also referred to as reflex sympathetic dystrophy) causally resulting from the fall.

In its Further Award, the trial court specifically noted the findings and opinions of Soliman and Colon that Janet suffered obvious autonomic disturbances of the hand and had improvement with sympathetic blocks, leading to a diagnosis of complex regional pain syndrome caused by the accident. The trial court weighed these opinions against opposing evidence, including the opinions of Shah and Greene and the results of a bone scan.

The trial court noted that while Shah initially indicated that Janet had reached maximum medical improvement, Shah was careful to indicate that it was only from a "neurological standpoint" and he also indicated in his office records that Janet might well need a referral to a pain management doctor "to rule out a reflex sympathetic dystrophy." We also note that Shah later determined that Janet did, in fact, suffer from severe left arm complex regional pain syndrome, which was ongoing since the wrist surgery.

With regard to Greene's opinion, the trial court noted that his opinion was set forth in a very brief handwritten response to questions posed by RTG Medical's counsel, which response was "not detailed, but rather, largely conclusory in nature." The court further stated, in reference to Greene's opinion:

> To simply say that pain is subjective (a truism) and that [Janet's] loss of hand motion is not physiologic fails to address [Janet's] obvious autonomic disturbances of the hand such as temperature differences, cyanosis, hyperesthesia, dysesthesia and allodynia referenced by

Dr. Soliman in his report and verified by the multiple examinations performed by Dr. Colon.

Consequently, the trial court gave very little weight to Greene's opinion owing to the lack of a detailed opinion as requested by RTG Medical's own counsel.

Finally, the trial court acknowledged RTG Medical's assertion that the bone scan of Janet's hand and wrist did not support a diagnosis of reflex sympathetic dystrophy. Although Janet did not challenge the results of the bone scan, the court noted the evidence that there is no specific diagnostic test for complex regional pain syndrome and based upon Soliman's other findings supporting the existence of the syndrome, it was not inclined to deem the bone scan determinative.

The trial court was free to accept or reject opinions from the various expert witnesses. See *Green v. Box Butte General Hosp.*, 284 Neb. 243, 818 N.W.2d 589 (2012). We give due deference to the compensation court as sole judge of witness credibility and testimonial weight. There was clearly sufficient medical evidence adduced upon which the trial court could find the existence of complex regional pain syndrome and that such injury was causally connected to the accident. These factual findings were not clearly wrong and will not be disturbed on appeal.

(b) Depression

RTG Medical asserts that Janet's depression was not causally related to the accident. Rather, RTG argues the depression resulted from the deaths of Janet's husband and daughter.

In addition to physical impairments, psychological injuries are compensable under the workers' compensation scheme. *Worline v. ABB/Alstom Power Int. CE Servs.*, 272 Neb. 797, 725 N.W.2d 148 (2006). The burden is on the claimant to prove by a preponderance of evidence that his disability is the result of an accident arising out of his employment. *Id*. Where the evidence is sufficient to permit the trier of fact to find that a psychological injury is directly related to the accident and the employee is unable to work, the employee is entitled to be compensated. *Id*.

A preexisting disease and an aggravation of that disease may combine to produce a compensable injury. *Manchester v. Drivers Mgmt.*, 278 Neb. 776, 775 N.W.2d 179 (2009). See, also, *Heiliger v. Walters & Heiliger Electric, Inc.*, 236 Neb. 459, 461 N.W.2d 565 (1990) (claimant entitled to award if burden of proof is satisfied, even though preexisting disability or condition combined with the present work-related injury to produce the disability for which the claimant seeks an award). By a preponderance of evidence a claimant must prove that the claimant's employment proximately caused the claimed injury or disability and thereby correspondingly negate that a claimant's condition existing independent of the claimant's employment and before a work-related incident alleged to be a cause of the claimed disability is the sole cause of the disability for which compensation is sought. *Heiliger v. Walters & Heiliger Electric*, *Inc., supra*.

Upon our review, considering the evidence in a light most favorable to Janet, we find the trial court did not err in concluding Janet suffered from a mental health injury resulting from the fall.

In its Further Award, the trial court specifically relied upon the opinions of Strobbe, Janet's primary care physician, and Devabhaktuni, who both causally linked Janet's current psychological condition to the work accident of January 21, 2012. Both doctors recommended psychiatric

treatment, including medication and counseling. Devabhaktuni determined that Janet had yet to reach maximum medical improvement with regard to her psychiatric condition.

The court noted the independent psychiatric evaluation by Maher in early 2015 which acknowledged that while Janet's life experiences including the loss of her husband contributed to her overall psychological condition, the "first and most significant is her physical injuries and associated disability as well as the effect on her work-life and self-esteem." The court also noted Maher's acknowledgement that "further treatment might result in a higher level in well-being" despite finding that she had reached maximum medical improvement. We also note that Maher specified that Janet's physical and psychological condition are "deeply and fundamentally related."

After considering the foregoing opinions, the trial court concluded that Janet had sustained a psychological "insult" in the form of an aggravation of her preexisting depressive condition and she had not reached her true maximum healing from her psychiatric injury "according to the more persuasive medical evidence presented."

The court's factual findings were not clearly wrong and will not be disturbed on appeal.

### 2. ONGOING DISABILITY PAYMENTS

RTG Medical argues that Janet's lack of work restrictions and demonstrated ability to return to employment following the accident precluded an award of ongoing temporary total disability benefits pursuant to Neb. Rev. Stat. § 48-121(1) (Reissue 2010).

An employee's return to work does not in every case terminate an employee's total disability from a work-related injury and does not preclude a finding that the employee's total disability continues notwithstanding the return to work. *Heiliger v. Walters & Heiliger Electric, Inc.*, 236 Neb. 459, 461 N.W.2d 565 (1990). See, also, *Godsey v. Casey's Gen. Stores, Inc.*, 15 Neb. App. 854, 738 N.W.2d 863 (2007).

In a workers' compensation case, total disability does not mean a state of absolute helplessness. It means that because of an injury, (1) a worker cannot earn wages in the same kind of work, or work of a similar nature, that he or she was trained for or accustomed to perform or (2) the worker cannot earn wages for work for any other kind of work which a person of his or her mentality and attainments could do. *Money v. Tyrrell Flowers*, 275 Neb. 602, 748 N.W.2d 49 (2008).

Based upon its detailed findings regarding Janet's additional injuries as outlined above, the trial court rejected RTG Medical's petition to modify to the extent that it requested a reduction in benefits owed to Janet. The court found that Janet is entitled to ongoing temporary total disability benefits as she has not yet reached maximum medical improvement for all of the injuries sustained in the accident. Upon our review, we find no error in this determination. Janet's brief and unsuccessful attempts to return to employment do not preclude a finding that Janet's disability continues notwithstanding these attempts to return to work. The record supports that Janet is unable to achieve regular employment. Further, contrary to the assertion of RTG Medical, both Shah and Strobbe imposed highly restrictive conditions on the use of her left hand.

3. AWARD OF PENALTIES AND INTEREST

RTG Medical asserts that the trial court erred in awarding Janet a waiting-time penalty and interest for late payment of temporary total disability benefits.

(a) Waiting-Time Penalty

An injured worker's entitlement to a waiting-time penalty is governed by Neb. Rev. Stat. § 48-125(1) (Reissue 2010), which provides in pertinent part:

> (1)(a) Except as hereinafter provided, all amounts of compensation payable under the Nebraska Workers' Compensation Act shall be payable periodically in accordance with the methods of payment of wages of the employee at the time of the injury or death. Such payments shall be sent directly to the person entitled to compensation or his or her designated representative except as otherwise provided in section 48-149.
>
> (b) Fifty percent shall be added for waiting time for all delinquent payments after thirty days' notice has been given of disability or after thirty days from the entry of a final order, award, or judgment of the compensation court . . .

The Nebraska Supreme Court has summarized Neb. Rev. Stat. § 48-125(1) as requiring an employer to pay the 50-percent waiting-time penalty in the following circumstances: if (1) the employer fails to pay compensation within 30 days of the employee's notice of a disability and (2) no reasonable controversy existed regarding the employee's claim for benefits. *Manchester v. Drivers Mgmt.*, 278 Neb. 776, 775 N.W.2d 179 (2009) (citing *Lagemann v. Nebraska Methodist Hosp.*, 277 Neb. 335, 762 N.W.2d 51 (2009)).

A reasonable controversy may exist (1) if there is a question of law previously unanswered by the appellate courts, which question must be answered to determine a right or liability for disposition of a claim under the Nebraska Workers' Compensation Act, or (2) if the properly adduced evidence would support reasonable but opposite conclusions by the Nebraska Workers' Compensation Court concerning an aspect of an employee's claim for workers' compensation, which conclusions affect allowance or rejection of an employee's claim, in whole or in part. Whether a reasonable controversy exists under Neb. Rev. Stat. § 48-125 is a question of fact. *Manchester v. Drivers Mgmt.*, *supra*.

RTG Medical argues that the imposition of penalties for the late payment of temporary total disability benefits was error because it was investigating Janet's third-party employment during this period. RTG Medical asserts that such employment created a reasonable controversy regarding Janet's claim for benefits, thereby excusing RTG Medical's late payments.

Upon our review, we find there did not exist a reasonable controversy on the basis of employability which would excuse late payment of benefits by RTG Medical. As discussed in the previous section, Janet's attempts to return to employment were brief and unsuccessful. And, these two unsuccessful attempts to return to work predated the compensation court's original order entered upon the parties' stipulation, which found Janet had not yet reached maximum medical improvement and ordered the payment of temporary total disability benefits. In addition, various work restrictions were placed upon her during the period that RTG Medical claims there was a reasonable controversy.

The trial court did not err in finding that there existed no reasonable controversy as to RTG Medical's liability for payment of the temporary total disability payments, and the awarding of penalties pursuant to Neb. Rev. Stat. § 48-125 was not erroneous.

(b) Interest

Neb. Rev. Stat. 48-125(3) (Reissue 2010) provides for interest to apply to those weekly compensation benefits awarded which have accrued as of the date payment is made by the employer. The trial court calculated the amount of interest due on the delinquent disability payments to be $8.02. Upon our review, we find no error in the compensation court's award of interest.

### 4. AWARD OF ATTORNEY FEES

RTG Medical argues that the imposition of attorney fees for the delayed authorization of mental health treatment was error. RTG Medical claims a reasonable controversy existed regarding the existence of causation linking Janet's depression with the injury as opposed to the deaths of her husband and daughter, relying upon Maher's opinion that Janet reached maximum medical improvement with regard to her mental condition.

An injured worker's entitlement to attorney fees is governed by Neb. Rev. Stat. § 48-125(2) (Reissue 2010), which provides in part:

> Whenever the employer refuses payment of compensation or medical payments subject to section 48-120, or when the employer neglects to pay compensation for thirty days after injury or neglects to pay medical payments subject to such section after thirty days' notice has been given of the obligation for medical payments, and proceedings are held before the Nebraska Workers' Compensation Court, a reasonable attorney's fee shall be allowed the employee by the compensation court in all cases when the employee receives an award.

The plain language of this statute allows an award of attorney fees if the employer is delinquent in paying medical expenses. *VanKirk v. Cent. Cmty. College*, 285 Neb. 231, 238, 826 N.W.2d 277, 282 (2013). This statute does not authorize the award of an attorney fee where there exists a reasonable controversy between the parties as to the entitlement of compensation. *Beavers v. IBP, Inc.*, 222 Neb. 647, 385 N.W.2d 896 (1986).

The trial court found that while Maher's February 17, 2015 report created a reasonable basis upon which to deny further psychiatric treatment after the date of the report, it determined that there was no reasonable basis for RTG Medical's refusal to pay for mental health treatment prior to that date. The trial court relied upon the opinions of Strobbe and Devabhaktuni in making this determination. Upon our review, we find no error in the trial court's determination. The record supported that, at least prior to February 17, 2015, the only medical opinions rendered established that Janet's mental health condition was causally related to the accident, that she had not reached maximum medical improvement for this condition, and she was in need of further treatment. RTG Medical was notified of Janet's mental health condition through letters sent by her attorney, in May 2013 and July 2013, specifically referencing Strobbe's opinion that a causal connection was present between employment injury and depression, along with a recommendation for treatment.

- 14 -

There did not exist a reasonable controversy at that time regarding the cause of the aggravation of Janet's preexisting depression which would excuse delayed authorization of treatment by RTG Medical.

We conclude that the compensation court did not err in finding that RTG Medical had no reasonable basis for denying mental health treatment authorization prior to February 2015. The award of attorney fees on this basis was appropriate under Neb. Rev. Stat. § 48-125(2).

## VI. CONCLUSION

Upon our review, we find that the workers' compensation court did not err in its award of ongoing temporary total disability benefits and medical expenses along with penalties, interest, and attorney fees. Accordingly, we affirm.

AFFIRMED.